775 P.2d 132

**Paul HOFFMAN, Plaintiff–Respondent,**

v.

**UNITED SILVER MINES, INC., Defendant–Appellant.**

**No. 16861.**

Court of Appeals of Idaho.

April 3, 1989.

Rehearing Denied June 2, 1989.

Petition for Review Denied July 11, 1989.

Lloyd J. Webb (Webb, Burton, Carlson, Pedersen & Webb), Twin Falls, for defendant-appellant.

Harold A. Hintze, Provo, Utah, and Terry R. McDaniel (Nelson, Rosholt, Robertson, Tolman & Tucker), Boise, for plaintiff-respondent.

BURNETT, Judge.

"Resolve me of all ambiguities!" This lament of Christopher Marlowe, the sixteenth century poet-playwright, echoes in the case now before us. The appeal arises from a dispute over the language of an agreement for development of a silver mine. We must decide whether the agreement is ambiguous and, if so, whether the district court properly resolved the ambiguity, giving the agreement its intended meaning. For reasons explained below, we affirm the district court's judgment in part, vacate it in part, and remand the case.

## I

The facts essential to our opinion are undisputed. In Box Elder County, Utah, one mile south of the Idaho boundary, lies a tract of land known as the Vipont Silver Mine. From 1919 to 1923, the mine produced more than three million ounces of silver and eight thousand ounces of gold. After the mine was closed, heaps of "tailings" and "dumps" remained as visual reminders of the wealth extracted from the earth below. Decades passed. Patented mining claims on the property were leased by the owner, Bannock Silver Mining Company, to United Silver Mines, Inc., a family corporation controlled by Thomas F. Miller. As an experienced geologist, Miller was convinced the mine could become productive again. He had a plan, but he needed money.

Paul Hoffman, a venture capitalist, became interested in developing the mine. He discussed with Miller a two-phase investment scheme. In Phase I, Hoffman would make $750,000 available for the construction of a new tunnel and for other

expenditures necessary to reactivate the underground mining operation. In Phase II, Hoffman would have the option of investing an additional $1,000,000 for construction of a mill to process the extracted ores. This seemingly simple proposal became complex as details were studied and new ideas were propounded. The negotiations took a fateful turn when the parties discussed the possibility of leaching silver from the "tailings" and "dumps" above ground. The leaching operation came to be regarded as a potential source of funds for the underground mining project. As the parties attempted to define the role of the leaching operation in financing the Phase I development, they created doubt about Hoffman's responsibility to contribute $750,000 of his own money during that phase. The seeds of ambiguity were sown.

One draft agreement yielded to another in a negotiating process that consumed several months. Ultimately, the parties signed a sixteen-page agreement establishing a limited partnership for development of the Vipont Silver Mine. Pertinent excerpts of that agreement are set forth in the appendix to this opinion. The agreement, supplemented by a contemporaneous "financing agreement," provided that Miller's corporation, United Silver Mines, Inc., would be the general partner and that Hoffman would be a limited partner. The general partner would manage the partnership's business while the limited partner would supply money.

In its broad outline, the limited partnership agreement adhered to the parties' original concept of a two-phase investment, the first consisting of $750,000 and the second (at Hoffman's option) consisting of $1,000,000. With respect to Phase I, the agreement provided that Hoffman would furnish $100,000 to obtain ownership of the leased mining claims; that Hoffman would transfer another $25,000 into a partnership bank account; and that Hoffman would make an additional $275,000 available, as needed, for work in progress. These payments would total $400,000, leaving a balance of $350,000 to be invested in Phase I. With respect to this balance, the agreement attempted to integrate Hoffman's invest-

ment obligation with the utilization of revenues expected from the leaching operation.

Unfortunately, the agreement did not speak with one voice on how this integration would be achieved. In some provisions, the agreement suggested that the $350,000 balance would come entirely from the leaching operation, leaving Hoffman with no obligation in Phase I beyond providing the initial $400,000. At section 2.2, certain language derived from earlier drafts, indicating that the limited partner had agreed to provide $750,000, was deleted. In its place, the parties inserted a hand-written reference to section 3.2 of the agreement. Section 3.2(d) stated that "[t]he balance of $350,000 needed to complete financing of Phase I is to come from revenues retained by the partnership from the processing of the tailings and dumps on the Vipont Silver Mine property, as further described in Section 4.1...." At section 4.1, the agreement provided that the limited partner would be entitled to an 80% share of the net profits from the leaching operation, but that this share would be retained by the partnership until the $350,000 investment balance had been funded.

In other provisions, however, the agreement suggested that Hoffman had an ultimate responsibility for making the entire $750,000 investment in Phase I, even if the leaching operation did not produce the anticipated net profits. In section 2.2, where the parties had deleted a reference to Hoffman's responsibility for $750,000, the parties allowed other language to remain which stated that Hoffman would "provide and/or arrange for financing in the amount of $1,750,000" for Phases I and II combined. Section 3.2 similarly recited that the limited partner "agree[d] to provide and/or arrange for financing in the amount of $1,750,000 in order to assure that the partnership will have sufficient funds available to mine and process ores extracted from the Vipont Silver Mines." Moreover, section 4.1(b), authorizing retention of the limited partner's 80% share of net profits from the leaching operation until $350,000 had been obtained, described this procedure as

a method *"to assist* in financing the Phase I development...." (Emphasis added.)

Thus, the agreement was subject to varying interpretations of the relationship between the limited partner's investment in Phase I and the net profits anticipated from the leaching operation. The agreement was more clear, however, in its expression of the partnership's obligation toward the limited partner. The partnership was required to give the limited partner short-term and long-term consideration for his investment. The short-term consideration was set forth in sections 3.2(f) and 3.2(g) of the agreement. The limited partner's advances of money were characterized as "loans," secured by a "lien" on the general partner's interest and on the partnership itself. The "loans" were repayable with interest "equal to one percentage point above the prime interest rate...." As explained in section 4.2, such repayment would be made by allocating to the limited partner 80% of the net revenues from the underground mining development and 80% of the net profits of the leaching operation (after $350,000 had been retained for the Phase I development).

The long-term consideration for the limited partner's investment was described in section 4.3 of the agreement. The limited partner would receive 25% of the partnership's future net revenues after the "loans" had been repaid. Section 4.3 stated that the limited partner would be "entitled" to this "25% interest in the partnership as soon as the Phase I development has been completed through the expenditure of the $750,000 which will be required therefor."[1] Similarly, section 9.5 stated that "[i]n the event Phase I is completed ... the limited partner shall be entitled to a 25% interest...." Thus, the agreement

plainly contemplated that Phase I would be completed, and the limited partner's entitlement to a 25% interest would arise, only when the expenditure of $750,000 had occurred. On this point, sections 4.3 and 9.5 were consistent with section 3.2, which defined Phase I as "[t]he period of time during which the initial $750,000 ... is being spent...."

Thus, the agreement was clear in one respect but unclear in another. It was clear in its delineation of the limited partner's rights upon completion of Phase I. But it was unclear on whether his obligation during that phase was to invest $750,000, or to invest $400,000 with the other $350,000 coming from the leaching operation. Despite this imperfection, the agreement was signed and the partnership began to develop the Vipont Silver Mine. Hoffman contributed approximately $436,000 to the partnership. The general partner, United Silver, used some of this money to start the leaching operation. The revenues derived from that operation were disappointing. Although the record does not show precisely what revenues were generated, nor whether any such revenues were "net" after deduction of costs, it is undisputed that the leaching operation had fallen short—by the time this case was tried—of providing sufficient net profits to bridge the gap between Hoffman's investment of $436,000 and the Phase I requirement of $750,000.

When problems in the leaching operation became apparent, Hoffman requested more detailed reports on the partnership's activities. Dissatisfied with the reports received, he demanded access to the partnership's books. When United Silver, as the general partner, did not comply, Hoffman

---

1. Section 4.3 further provided that the limited partner would receive an additional 25% interest if he participated fully in Phase II, requiring an expenditure of $1,000,000. The same section went on to say that if the limited partner furnished or arranged for total financing less than the total of $1,750,000 for Phases I and II, his future interest would be "decreased proportionately" from the 50% he otherwise would have been entitled to receive. Although this language *raises a question of whether the limited partner might be entitled to some fractional interest* even if he made a contribution of less than $750,000 for Phase I, Hoffman has made no such argument in this litigation. He appears to accept an interpretation of section 4.3 which makes the proportionate reduction language applicable only to a contribution of less than $1,000,000 in Phase II. With respect to the 25% interest available for Phase I, Hoffman's position is that he has fully performed his obligation by furnishing more than $400,000. He has made no claim to any proportionately decreased share based on partial performance.

brought this suit. He asked the court to compel a full accounting; to grant access to the partnership's books; to award damages for denial of access to those books; and to declare that he had fully performed his obligation in Phase I, entitling him to a 25% interest in the partnership. The general partner counterclaimed, alleging that Hoffman had breached an obligation to furnish $750,000. The general partner sought damages for the alleged breach and a declaration that Hoffman was entitled to nothing from the partnership.

The district court held that the limited partnership agreement was ambiguous with respect to Hoffman's obligation during Phase I. The judge tendered the issue to a jury upon special interrogatories. As we will explain more fully in the next part of this opinion, the jury determined that Hoffman was entitled to a 25% interest in the partnership upon furnishing $400,000. The district court entered judgment upon the verdict, declaring Hoffman to be the owner of a 25% interest and awarding him other relief. This appeal followed.

## II

As we turn to the issues, we acknowledge the extraordinary burden this litigation has placed upon the parties, their counsel and the district court. For nearly five years, the case went through extensive discovery, a host of pretrial proceedings, a jury trial and numerous post-trial motions. On appeal, the attorneys filed more than 200 pages of briefs (excluding appendices), containing a virtual cyclopedia of legal principles governing the construction of contracts, jury verdicts and special interrogatories. Despite this remarkable effort by counsel, we believe the appeal may be decided on just two dispositive issues: (a)

whether the limited partnership agreement was ambiguous, as the district court held; and, if so, (b) whether the question of interpretation was properly put to the jury and ultimately reflected in the judgment. We will discuss these issues in turn.

## A

The parties have presented a full spectrum of arguments on the issue of ambiguity. United Silver contends that the contract was not ambiguous—that it clearly required the limited partner to furnish the entire $750,000 investment in Phase I, regardless of the results obtained from the leaching operation. Accordingly, United Silver urges that it should have received a directed verdict or judgment n.o.v. In contrast, Hoffman argues that if the agreement indeed was unambiguous, it clearly required him only to provide $400,000 in Phase I. Both parties also argue, in the alternative, that if the agreement was ambiguous, the evidence of intent favored their respective positions.

 Whether an agreement is ambiguous is a question of law.[2] *E.g., DeLancey v. DeLancey,* 110 Idaho 63, 714 P.2d 32 (1986). If the contract is not ambiguous, its interpretation is another question of law, to be determined by the trial judge rather than by a jury. *E.g., Luzar v. Western Surety Co.,* 107 Idaho 693, 692 P.2d 337 (1984). Conversely, if a contract is ambiguous, its meaning turns on the underlying intent of the parties. Intent is a question of fact, to be determined by a jury in light of the language of the entire agreement, the parties' conduct, the course of prior negotiations, and other extrinsic information. *Olmstead v. Heidelberg Inn, Inc.,* 105 Idaho 774, 673 P.2d 76 (Ct.App.

---

**2.** In the discussion which follows, we rely upon principles of Idaho law and cite Idaho authorities. In so doing, we are not unmindful of provisions in the limited partnership agreement indicating that laws of other states might be applicable. At section 1.1, the agreement recites that the limited partnership is formed pursuant to the Utah Limited Partnership Act. The agreement further states, at section 10.4, that during Phase I the agreement shall be construed and enforced according to the laws of the State of

Illinois. Nevertheless, the limited partner chose to bring this lawsuit in Idaho, presumably because the general partner—United Silver Mines, Inc., controlled by Thomas F. Miller—has its principal office in Oakley, Idaho. Neither of the parties has argued that Utah or Illinois law is materially different from Idaho law with respect to the issues addressed in today's opinion. Indeed, Hoffman's counsel has described the choice of law issue as "academic." Consequently, we do not tarry over it.

1983); *Bennett v. Bliss*, 103 Idaho 358, 647 P.2d 814 (Ct.App.1982).

■ Here, as we have noted, the district judge deemed the limited partnership agreement to be ambiguous with respect to whether the limited partner was required to furnish the full $750,000, or only $400,000 of that amount, in order to fulfill his obligation in Phase I. This determination of ambiguity is subject to free review on appeal. *Clearwater Minerals Corp. v. Presnell*, 111 Idaho 945, 729 P.2d 420 (Ct. App.1986). A contract is ambiguous, as a matter of law, if it is reasonably subject to conflicting interpretations. *Rutter v. McLaughlin*, 101 Idaho 292, 612 P.2d 135 (1980); *Newman v. Associated Systems, Inc.*, 107 Idaho 922, 693 P.2d 1124 (Ct.App. 1985). In Part I of this opinion, we have identified two varying interpretations that might have been given to the language in the limited partnership agreement which attempted to integrate the limited partner's investment with the utilization of net profits from the leaching operation. Both of these interpretations are reasonable. Accordingly, we uphold the district judge's ruling that the agreement was ambiguous on this point. The judge properly tendered the issue to the jury for a determination of the parties' underlying intent.

■ During the trial, the individuals who negotiated the agreement—Hoffman and Miller—testified at length regarding the purposes of the limited partnership and the significance of particular words chosen or deleted from the final draft of the agreement. In addition, an attorney (other than present counsel for the parties) testified as to his participation in the drafting process. He presented copies of several "marked up" drafts depicting the evolution of the agreement. We need not recount the evidence in detail here. It is sufficient to say that the record contains substantial evidence in support of the jury's determination that the parties intended to impose upon the limited partner an obligation only to furnish $400,000 during Phase I, the remaining $350,000 to come from the leaching operation. The jury's verdict on that point will not be disturbed.

B

■ A more subtle and troubling question is whether this determination by the jury constituted a sufficient basis for the district court to enter a judgment declaring that Hoffman had become the owner of a 25% interest in the partnership. The trial judge evidently treated this 25% entitlement as an automatic and immediate consequence of Hoffman's performance of his obligation—as determined by the jury— to furnish $400,000 in Phase I. Indeed, the jury made that determination in response to a special interrogatory which combined the issues of performance and entitlement to a percentage share of the partnership:

> As you, the jury, interpret the Limited Partnership Agreement (Exhibit P–5), was the plaintiff Paul Hoffman entitled to a 25% interest in the Limited Partnership upon his lending to the Limited Partnership the sum of $400,000, with the remaining $350,000 anticipated to complete "Phase I" of development of the mine to come from funds generated and retained by the partnership through the leaching operation?

The jury answered "yes" to this compound question. United Silver now contends that the performance and entitlement questions should have been framed separately, as United Silver had suggested in its requested jury instructions and interrogatories. In any event, United Silver argues, the judge erred by equating performance of the $400,000 investment obligation with an immediate entitlement to a 25% interest in the partnership.[3]

3. United Silver further contends that because this error was contained in a compound interrogatory, it infected the jury's determination of the limited partner's obligation. Thus, United Silver asks us to order a new trial due to a "failure of the adjudicatory process." We are not persuaded that the error had such sweeping effect. We acknowledge that compound interrogatories are discouraged. *See generally Anderson v. Gailey*, 97 Idaho 813, 555 P.2d 144 (1976). However, jury instructions and interrogatories must be examined as a whole. *E.g., Zolber v. Winters*, 109 Idaho 824, 712 P.2d 525 (1985). Having done so in this case, and having

■ As we have explained, the limited partnership agreement dealt · separately with the limited partner's obligation in Phase I and the limited partner's entitlement upon completion of that phase. Although the agreement was not clear on the first issue, it was clear on the second. It stated that the limited partner would be entitled to the 25% interest "as soon as the Phase I development has been completed through the expenditure of the $750,000 which will be required therefor." Thus, although the agreement could be interpreted—as the jury found—to permit an outlay of $400,000 by the limited partner during Phase I, it could not be construed as entitling him to a 25% interest before the total investment, including any net profits from the leaching operation, totaled $750,000. On this point, the agreement was unambiguous. Therefore, with all due respect to the district court, we hold that the judge erred in giving the immediate entitlement issue to the jury. The error was merely exacerbated by framing the issue in a compound interrogatory. The error subsequently was replicated in the court's judgment upon the verdict, declaring Hoffman to be the present owner of a 25% interest based upon his payment of at least $400,000 during Phase I.

■ During oral argument on appeal, Hoffman's counsel acknowledged with commendable candor that the agreement did not provide an immediate entitlement to a 25% interest for an investment of at least $400,000 but less than $750,000. Characterizing this as a "hiatus" in the contract, counsel argued that the judgment giving Hoffman a present interest of 25% should be upheld on "equitable" grounds. He urged that the risk of failure in the leaching operation should be borne exclusively by the general partner and that an immediate entitlement to the 25% interest would avoid a "forfeiture" of Hoffman's $436,000 investment.

We disagree. By using the term "hiatus," counsel implies that the agreement is flawed by a void, or discontinuity, which must be filled by an equitable remedy. We perceive no such flaw. There is nothing illogical about an agreement which allows the limited partner to rely on the leaching operation to fund part of the $750,000 investment but which still requires the entire $750,000 to be attained before the limited partner receives his 25% long-term interest. Of course, there is a risk that funds derived from the leaching operation will be inadequate or will be realized more slowly than the limited partner would prefer. However, the agreement does not make the general partner a guarantor of the leaching operation's performance. At section 4.1, referring to the "tailings" and "dumps," the agreement describes the leaching operation as a process of "recovering minerals which *may* be contained therein." (Emphasis added.)

■ Neither are we persuaded that the limited partner faces the prospect of an inequitable "forfeiture" if he is not given an immediate 25% interest. As mentioned earlier, the agreement treats all funds advanced by the limited partner as "loans," secured by a "lien" on the general partner's interest and on the partnership itself. Moreover, the limited partner is not forced

---

viewed the instructions and interrogatories in the context of the evidence at trial, we believe the jury's determination regarding the $400,000 obligation was properly focused on the issue of the parties' intent.

United Silver also has attacked the compound interrogatory from another direction, arguing that it failed to frame yet another issue—whether, if Hoffman's obligation in Phase I was to furnish only $400,000, he actually fulfilled that obligation since some of the money was used in the leaching operation rather than in the underground mining development. This attack is ill-founded. United Silver, as the general partner, determined the manner in which money re-

ceived from the limited partner would be utilized. The limited partnership agreement contained no provision depriving the limited partner of credit against his investment obligation if the general partner chose to use the money for one aspect of the development rather than another. Moreover, we note that United Silver did not present this issue below until it moved to amend its counterclaim late in the trial. The trial judge denied that motion, deeming it to be untimely. The ruling was well within the judge's sound discretion. *See generally Cougar Bay Company, Inc. v. Bristol,* 100 Idaho 380, 597 P.2d 1070 (1979).

to rely upon the leaching operation to complete the Phase I investment. He is at liberty to make additional contributions, which also will be treated as lien-secured loans, in order to reach the $750,000 figure. Indeed, the agreement provides at section 4.1(d) that the limited partner, "at his discretion," may advance money to supplement the cash flow from the leaching operation. Hoffman's election not to make such further advances may be a sound weighing of business risks on his part, but it triggers no equitable entitlement to a 25% interest in the partnership at a time earlier than the contract clearly provides.

■■■ Therefore, although we sustain the district court's determination that it is permissible for the limited partner to invest $400,000 in Phase I, leaving the balance of $350,000 to be funded by the leaching operation, we also hold that any entitlement to a 25% long-term interest in the partnership must await the completion of Phase I through an aggregate investment of $750,-000. That portion of the district court's judgment which declares Hoffman presently to have "a twenty-five percent (25%) ownership interest in [the] partnership" is hereby set aside. The district court is instructed to modify the judgment on remand. The remainder of the judgment— denominating funds advanced by the limited partner as "loans," ordering a formal accounting and periodic audits of the partnership's books, and awarding $1,500 in damages for earlier denial of access to the books—is affirmed.[4] No costs or attorney fees are awarded on appeal.

WALTERS, C.J., and SWANSTROM, J., concur.

### APPENDIX

### EXCERPTS FROM LIMITED PARTNERSHIP AGREEMENT

This Agreement of Limited Partnership, entered into and effective as of the 30th day of April, 1977, by and between UNITED SILVER MINES, INC., a Utah Corporation, (hereinafter referred to as the "General Partner"), and PAUL HOFFMAN, a resident of the State of Indiana, (hereinafter referred to as the "Limited Partner").

\* \* \* \* \* \*

*Section 1.1—Formation of Partnership:*

The parties hereto hereby form a Limited Partnership pursuant to the provisions of *Utah Code Annotated 48–2–1 et seq.* (1953) and in accordance with the provisions of this Agreement, which organization is referred to herein as the "Partnership".

\* \* \* \* \* \*

*Section 2.1—Purposes and Powers of the Partnership:*

The general purpose of the Partnership shall be to invest in, explore for, and engage in the business of mining silver and other ores, principally on property located in the State of Utah, known as the Vipont Silver Mine.

\* \* \* \* \* \*

*Section 2.2—Expenditure of Capital:*

The primary purpose of the Partnership is the business of mining silver and other ores, the milling and processing of the extracted ores, and the sale of the end products of the milling and processing operations primarily on property located in the State of Utah, known as the Vipont Silver Mine, which is covered by a "Mine Lease" which is to be contributed to the Partnership by the General Partner, as described hereinafter. It is contemplated that the Limited Partner will provide and/or arrange for financing in the amount of $1,750,000.00 in order to assure that the Partnership will have sufficient funds available for such mining and processing. The manner in which this financing is to be provided is set forth in further detail hereinafter and in a separate agreement enti-

---

4. United Silver has questioned the treatment of Hoffman's advances to date as loans. However, the agreement states that "all" advances by the limited partner are loans. The agreement does not state that the advances must total $750,000 before any of them constitutes a loan. We have examined other issues raised by United Silver, and we deem them either to be without merit or to be answered by the analysis contained in this opinion.

tled "Financing Agreement". The period of time during which the initial $750,000.00 ~~(which the Limited Partner has agreed to provide or assure is available)~~ *See 3.2. b, c, d. P.H. T.F.M.* [handwritten alteration by parties] is being spent shall be referred to as "Phase I" and the period during which the final $1,000,000.00 (which the Limited Partner has agreed to provide and/or arrange for) is being spent shall be referred to as "Phase II".

\* \* \* \* \* \*

*Section 3.2—Contribution by Limited Partner:*

The Limited Partner agrees to provide and/or arrange for financing in the amount of $1,750,000.00 in order to assure that the Partnership will have sufficient funds available to mine and process ores extracted from the Vipont Silver Mine.

a) Immediately upon the signing of this Agreement the Limited Partner agrees to transfer to the Partnership 2,150,000 shares of stock in Bannock Silver Mining Company which it has acquired. The parties agree that for purposes of this Agreement the 2,150,000 shares of Bannock stock shall be valued at $100,000.00.

b) Also upon the signing of this Agreement the Limited Partner agrees to transfer $25,000.00 into a Partnership bank account and to thereafter replenish the bank account balance monthly to this level in order to provide working capital for the venture.

c) Thereafter, at the times and under the circumstances set forth in the Financing Agreement which is being executed this same date, the Limited Partner agrees to provide and/or arrange for $275,000.00 as required in purchasing equipment and supplies and providing working capital for the Partnership.

d) The balance of $350,000.00 needed to complete the financing of Phase I is to come from revenues retained by the Partnership from the processing of the tailings and dumps on the Vipont Silver Mine property, as further described in Section 4.1 of this Agreement.

e) The parties contemplate that Phase I will be completed sometime in 1978. Upon the completion of Phase I, the Limited Partner has an option for ninety (90) days to provide and/or arrange for additional financing in the amount of $1,000,000.00 in order to complete the Phase II development of the Vipont Silver Mine. If the additional $1,000,000.00 in financing is not provided and/or arranged for within the ninety (90) day period, the Limited Partner loses all right to participate in the Phase II development. The conditions and circumstances under which the contribution of this additional financing will occur are further set forth in the Financing Agreement which is being executed this same date.

f) All contributions to the Partnership by the Limited Partner shall be regarded as loans, to be repaid in accordance with Section 4.2 hereof. Each loan shall bear interest on the unpaid balance of principal at a rate which is equal to one percentage point above the prime interest rate as determined by the First National City Bank of New York at the time that the loan is made.

g) In order to secure the repayment of the contributions of the Limited Partner as provided for hereinabove, the Limited Partner shall be entitled to hold and claim a lien upon the interest of the General Partner and the Partnership in the Vipont Silver Mine property and upon any minerals produced therefrom until the contributions have been fully repaid.

\* \* \* \* \* \*

*Section 4.1—Sharing of Net Revenues from Processing of Existing Tailings and Dumps:*

There are presently tailings and dumps on the Vipont Silver Mine property which the parties anticipate processing for the purpose of recovering minerals which may be contained therein. All net revenues realized from the processing of existing tailings and dumps (gross revenue less the costs which may be properly allocated to processing these tailings and dumps) shall be divided and applied as follows:

a) 20% to the General Partner.

b) 80% to be retained by the Partnership to assist in financing the Phase I development

until a total of $350,000.00 has been retained.

c) After the Partnership has retained $350,000.00 the balance of the 80% share shall go to the Limited Partner to be applied to loans which he has made to the Partnership or, in the discretion of the Limited Partner, to be used for additional mine development.

d) The parties agree that underground mine development will not begin until sufficient processing of the tailings and dumps has occurred that, in the judgment of the Partners, the monthly production rate from the processing of the tailings and dumps can be determined. Once determined, if the status and prospects for the processing of the tailings and dumps are favorable (i.e. reasonably close to projections set out in a geological report on the Vipont Silver Mine by Thomas F. Miller dated February 10, 197_), the Limited Partner, at his discretion, agrees to advance money for the underground development in the event that the cash flow from the processing of the tailings and dumps does not keep up with the costs of the underground development.

### Section 4.2—Repayment of Loans Made by the Limited Partner:

If as a result of the underground development of the Vipont Silver Mine which is anticipated by the parties hereto commercial ore is recovered, the loans made to the Partnership by the Limited Partner shall be repaid out of the net revenues realized (gross revenues less all costs and expenses, direct or indirect, which may be properly allocated to the mining, milling and marketing of said ores). All such net revenues shall be divided 20% to the General Partner and 80% to the Limited Partner until the loans made by the Limited Partner to the Partnership have been fully repaid.

### Section 4.3—Sharing of Net Revenues from Underground Operations After the Loans Made by the Limited Partner Have Been Repaid:

At such time as the loans made by the Limited Partner to the Partnership have been repaid, additional net revenues (gross revenues less all costs and expenses, direct or indirect, which may be properly allocated to the mining, milling and marketing of said ores) shall be divided 50% to the General Partner and 50% to the Limited Partner. This assumes that the Limited Partner has provided or arranged for the full $1,750,000.00 to be made available to the Partnership to enable it to complete the Phase I and Phase II development. It is understood and agreed that the Limited Partner shall be entitled to a 25% interest in the Partnership as soon as the Phase I development has been completed through the expenditure of the $750,000.00 which will be required therefor. The Limited Partner shall be entitled to an additional 25% interest as soon as the Phase II development has been completed through the expenditure of the $1,000,000.00 which will be required therefor. To the extent that the Limited Partner provides and/or arranges for financing in an amount less than $1,750,000.00 his share of the net revenues shall be decreased proportionately from the 50% that he will be entitled to receive if the entire $1,750,000.00 is provided and/or arranged for in accordance with Section 3.2 hereof.

\*　\*　\*　\*　\*　\*

### Section 9.5—Election by Limited Partner Not to Participate in Phase II:

In the event that Phase I is completed and the Limited Partner is unable or elects not to provide and/or arrange for the financing needed to complete Phase II, the parties agree that the following shall occur:

a) The lien of the Limited Partner provided for by Section 3.2(g) shall continue until the loans made by the Limited Partner to the Partnership have been repaid;

b) The Limited Partner shall be entitled to receive 100% of the net revenues from the tailings and dumps and 80% of the net revenues from the mine production until his loans have been repaid;

c) Thereafter the Limited Partner shall be entitled to a 25% interest in the Partnership as provided for in Section 4.3.

\*　\*　\*　\*　\*　\*

*Section 10.1—Entire Contract:*

This Agreement constitutes the entire contract between the parties and there are no other or further agreements outstanding not specifically mentioned herein. By execution of this Agreement, the parties adopt all of the provisions of this Partnership Agreement.

\* \* \* \* \* \*

*Section 10.4—Place of Contract:*

During Phases I and II the parties agree that this Agreement is performable in the State of Illinois and shall be construed and enforced according to the laws of the State of Illinois in the courts of that State.