822 P.2d 549

**Kathryn Ann GEORGE, a single woman, Plaintiff–Appellant,**

v.

**UNIVERSITY OF IDAHO and the University of Idaho College of Law, Defendants–Respondents.**

**No. 18693.**

Court of Appeals of Idaho.

Nov. 26, 1991.

Petition for Review Denied Jan. 24, 1992.

Winston & Cashatt, Coeur d'Alene and Spokane, Washington, for plaintiff-appellant. F.J. Dullanty, Jr., argued.

Quane, Smith, Howard & Hull, Boise, for defendants-respondents. John P. Howard, argued.

SILAK, Judge.

This appeal involves a claim for breach of contract against the University of Idaho. Kathryn George sued the University for breach of a 1986 release agreement entered into by George, the University, and a former professor at the University, William Lee Eckhardt. In that agreement, George agreed to release claims of sexual harassment against Eckhardt and the University. The University moved for summary judgment, which motion was granted by the district court. For the reasons stated below, we vacate the judgment.

## Facts

Because we are reviewing a grant of summary judgment, we will recite the facts in a light most favorable to George, the non-moving party below. Kathryn George began attending the University of Idaho College of Law in the fall semester of 1985.

William Lee Eckhardt was a professor, and one of George's instructors, at the law school. During the fall semester of 1985, George and Eckhardt became personally acquainted and subsequently entered into an intimate relationship. At various times during the fall the parties expressed a desire to end the relationship. Finally, at some time in December prior to the semester's final examinations, George terminated the affair.

Despite George's requests that Eckhardt discontinue all contact with her, Eckhardt engaged in numerous attempts to persuade George to resume the relationship. Eckhardt made numerous overtures through personal conversations, letters, phone calls, and messages posted on the law school bulletin board, directed to George personally, and indirectly through her classmates, other professors, and her family. The content of these communications ranged between flattery and attacks on George's character. George asserts that Eckhardt's conduct, before and after the affair was terminated, also involved physical and emotional intimidation, in and out of the classroom. After the affair was terminated, Eckhardt's efforts to persuade George to resume the relationship became increasingly threatening and coercive. Once it became clear the relationship would not be resumed, Eckhardt's conduct became retaliatory.

When winter semester commenced in January 1986, Eckhardt continued to sexually harass George. On or about January 16, 1986, George contacted a woman law professor to determine if there was any way she could continue the course of study being taught by Eckhardt without having to attend his lectures. After this professor brought the situation to the attention of Sheldon Vincenti, Dean of the law school, Vincenti requested a meeting with George to discuss her claims regarding Eckhardt's conduct.

During her meeting with Vincenti, George disclosed the nature of her past and current relationship with Eckhardt and asked Vincenti to make arrangements for her to continue in Eckhardt's class without

having to attend personally. Vincenti granted this request, and also directed George to the office of Carol Hahn, the Affirmative Action Compliance Officer for the University. On or about that same day, George contacted Hahn to complain of Eckhardt's conduct. Thereafter, George submitted to Hahn a written statement dated January 21, 1986, detailing her relationship with Eckhardt and Eckhardt's harassing course of conduct. George also turned over to Vincenti the letters that she had received from Eckhardt.

On January 20, 1986, Dean Vincenti personally directed Eckhardt to have no further contact with George. On January 27, 1986, George complained to Hahn that Eckhardt was continuing to harass her. Both the University and George were aware that Eckhardt had been undergoing mental health treatment over a long period of time. In that regard, both George and the school officials were concerned about the form Eckhardt's possible retaliation might take.

On January 28, 1986, George was advised that the law school, through Richard D. Gibb, president of the University of Idaho, and Vincenti, had determined to execute an agreement containing a provision that Eckhardt would no longer harass George, and that in exchange George would be required to release all claims against the University and Eckhardt.

On January 29, 1986, two agreements were executed: a resignation agreement between Eckhardt and the University, and a release agreement between Eckhardt, the University, and George. The first agreement executed was the resignation agreement. At some time prior to execution of the resignation agreement, Eckhardt had tendered to the University an offer to resign on certain conditions. When President Gibb signed the resignation agreement on January 29, 1989, he accepted each and every term Eckhardt had proposed. The terms and conditions of the resignation agreement are summarized as follows: (1) that Eckhardt be granted an eighteen month leave of absence with pay; (2) that during the paid leave of absence Eckhardt

continue to receive full insurance and retirement benefits; (3) that Eckhardt vacate his office within a reasonable period of time; (4) that the University of Idaho, its President and Dean Vincenti use their best efforts to assist Eckhardt in securing other employment by accentuating the positive aspects of his performance at the law school; (5) that Eckhardt, George, and the law school execute a mutual release of claims in the form provided by Eckhardt's attorney; (6) that the resignation agreement be approved by all University officials whose approval was required to bind the University; and (7) that Eckhardt's resignation would not become effective until each and every condition of the resignation agreement was fully performed. In addition to the conditions enumerated above, the offer of resignation stated that it would automatically expire by 5:00 p.m. on January 29, 1986.

The fact that, under the terms of the resignation agreement, Eckhardt's resignation did not become effective until every condition of the agreement had been fully performed, raises two salient points: (1) Eckhardt's resignation would not become effective until the University, Eckhardt, and George entered into a mutually binding release agreement which was formulated by Eckhardt's attorney, and (2) Eckhardt would remain an employee of the University until July of 1987, when the eighteen month paid leave of absence expired.

Also on January 29, 1986, the University presented George with a release agreement, formulated by Eckhardt's attorney, for her signature. This agreement, however, contained no provision requiring Eckhardt to cease contact with George. George obtained the services of a lawyer, Allen Bowles, to assist her in having such a provision included in the agreement. Bowles phoned Eckhardt's attorney, Bill Thompson, to insist that a provision be included in the agreement to the effect that Eckhardt would no longer harass George. It was finally agreed that a mutual non-harassment clause would be included in the agreement. Bowles then called George to inform her that a non-harassment clause

was included in the agreement. That was the extent of Bowles' assistance to George.

The release agreement entered into by Eckhardt, the University, and George provides as follows:

This agreement, made this 29th day of January, 1986, by and between Professor W. Lee Eckhardt (hereinafter referred to as Eckhardt); the University of Idaho by and through its authorized representative, President Richard D. Gibb (hereinafter referred to as UI); and Kathryn George (hereinafter referred to as George);

WITNESSETH

That for and in consideration of the mutual covenants and conditions contained herein, each of the parties, Eckhardt, UI and George, does hereby for themselves and their legal representatives release and absolutely and forever discharge the others of and from all claims and demands, actions and causes of action, of every name and nature, so that none of the parties shall have any claim on the others, directly or indirectly, on any contract or supposed liability or thing or action undertaken, done or admitted to be done, from the beginning of the world to this day.

In addition to the above-referenced mutual considerations of release, the parties further agree that Eckhardt and George shall immediately surrender to the UI the originals and all copies of all documents and evidence supposed or intended to support or establish any and all claims by each of the parties hereto on the others. In return, the UI shall immediately destroy all copies and seal all originals, securing the same under lock and key; and the UI shall not, under any circumstances, release said originals or make and/or release copies unless directed by Court order or otherwise required by law. Additionally, Eckhardt and the UI hereby agree that this release agreement is subject to each and every provision and condition of Eckhardt's letter of conditional resignation dated January 29, 1986.

Further, in addition to the above-referenced mutual considerations of release, the parties further agree that Eckhardt and/or his agents shall refrain from having any intentional contact of any nature at his direction with George or her family, and that George and/or her agents shall refrain from having any intentional contact at her direction with Eckhardt or his family. Breach of this paragraph shall not in anyway affect the obligations of the UI hereunder to Eckhardt pursuant to the above-referenced conditional resignation.

The parties acknowledge that by reason of agreeing to this release and compromise, they have admitted no liability of any sort, and have made no representation as to liability, and the parties understand that this release is made as a compromise to avoid expense and to terminate all controversy and/or claims by any of the parties against the other(s).

In witness whereof, we have hereunto set our hands and executed this agreement in triplicate the day and year first above written.

Pursuant to the resignation agreement, the University continued to make full payment with benefits to Eckhardt through July, 1987. George continued as a student at the law school until her graduation in May of 1988.

After execution of the release agreement, Eckhardt engaged in a course of conduct to disparage George's character within the law school community. This conduct included writing letters to law school students and faculty, posting notes on the law school bulletin board, and writing letters to newspapers. George alleged that as a result of Eckhardt's conduct, she was subjected to the harassment, ridicule, and derision of various members of the law school's faculty and student body throughout her remaining two-and-one-half years at the school.

Eckhardt also attempted to place George in disrepute in Idaho's legal community statewide. After George graduated from law school in the spring of 1988, Eckhardt mailed a letter to each registered member

of the Idaho State Bar advising them that George was neither competent nor morally fit to practice law. Eckhardt also sent a letter to the Idaho State Bar Association opposing George's application to take the bar exam, contending that she was neither morally nor ethically competent.

No facts in the record indicate that, at any time subsequent to the execution of the release agreement, the University took any action either to prevent Eckhardt's conduct or to counteract its harmful effects on George.

It is also of significance to this case that the University of Idaho and its College of Law are duly recognized entities of the state, statutorily created pursuant to I.C. § 33–2801, *et seq*. As a state institution of higher education, the University has adopted various policies prohibiting the sexual harassment of its students. Following are pertinent excerpts from the University's Faculty–Staff Handbook:

### SEXUAL HARASSMENT

*A. POLICY.*

*A–1.* The university must maintain a learning and work environment for students and employees that is fair, humane, and responsible. Sexual discrimination, including sexual harassment, interferes with the educational process and with the productivity of the faculty and staff; thus, it is inimical to the university.

*A–2.* [S]exual harassment violates federal and state laws and the policies of the Board of Regents of the University of Idaho. It is, therefore, the policy of the University of Idaho to condemn sexual harassment.

*B. DEFINITION.*

*B–1.* Sexual harassment of a student is defined as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature when: (a) submission to such conduct is made either explicitly or implicitly a term or condition of the student's grade, receipt of a grade, or status as a student; (b) the student's submission to or rejection of such conduct is used as a basis for a decision affecting that student; or (c) such conduct has the purpose or effect of substantially interfering with the student's learning or learning performance, or creating an intimidating, hostile, or offensive learning environment. In addition, it includes behavior that overtly or covertly uses the power inherent in the status of a professor, teacher, or other officer to affect a student's educational experience or career opportunities by intimidating, threatening, or coercing the student to accept sexual advances or risk reprisal in terms of a grade, a recommendation, an opportunity for professional growth, or a job.

*C. INVESTIGATION OF COMPLAINTS.*

[Sub-part C sets forth the University's policies and procedures for reporting and investigating suspected cases of sexual harassment.]

*D. RESOLUTION OF COMPLAINTS.*

*D–1.* ....

*D–2.* If the investigative authority determines that sexual harassment did occur, UI will take immediate and appropriate corrective measures, including disciplinary action commensurate with the scope and severity of the occurrence. Such disciplinary action may include, but is not limited to, warning, reprimand, demotion, suspension, or dismissal with notation in the personnel file. In addition, UI will make every effort to provide appropriate relief for the victim....

In addition to the policies and procedures set forth above, the University's Faculty–Staff Handbook includes a statement regarding the agreement entered into between the University and its students.

### MUTUAL RESPONSIBILITY

UI's acceptance of a student for admission and the student's enrollment in the university constitute an agreement of mutual responsibility.... UI's part is to carry out its commitment to higher education, to fulfill its responsibilities in pursuit of the academic goals and objectives

of all members of the university community,....

George commenced the current action against the University by filing a complaint on January 3, 1989. Her complaint alleged various causes of action sounding in tort and contract law. On March 22, 1990, the district court granted the University's motion for summary judgment on all claims. George appeals only the dismissal of her claims which were based on breach of contract.

### Standard of Review

On appeal, George asks us to vacate the district court's order granting the University's motion for summary judgment. Whether to grant a motion for summary judgment is a question of law, which we review freely, applying the same standards that were incumbent on the district court. Following is a review of those standards.

Summary judgment shall be granted to the moving party "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c); *Bonz v. Sudweeks,* 119 Idaho 539, 541, 808 P.2d 876, 878 (1991). In ruling upon a motion for summary judgment, all disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. *Bonz,* 119 Idaho at 541, 808 P.2d at 878. The burden of proving the absence of a genuine issue of material fact rests at all times upon the moving party. *G & M Farms v. Funk Irrigation Co.,* 119 Idaho 514, 517, 808 P.2d 851, 854 (1991). However, to withstand a motion for summary judgment, the non-moving party's case must consist of more than speculation; it must create a genuine issue regarding a material fact. *G & M Farms,* 119 Idaho at 517, 808 P.2d at 854. A mere scintilla of evidence is not enough to create a genuine issue. *Id.*

### Issues on Appeal

Pursuant to the facts and standards of review articulated above, we are faced with two issues on appeal: (1) whether there is a genuine issue concerning the alleged breach of the terms of the January 29, 1986, release agreement among Eckhardt, the law school, and George, and (2) whether there is a genuine issue as to the alleged breach of an implied agreement by the University to take reasonable measures to maintain a harassment-free educational environment. We will discuss each of these issues in turn.

### Analysis

Resolution of this case requires us to construe the written and implied contracts which George claims were breached by the University. Our object in construing a contract is to ascertain and give effect to the intent of the parties. *Luzar v. Western Sur. Co.,* 107 Idaho 693, 697, 692 P.2d 337, 341 (1984); *Rutter v. McLaughlin,* 101 Idaho 292, 293, 612 P.2d 135, 136 (1980). To the extent that the terms of a contract are clear and unambiguous, their meaning and legal effect are questions of law to be determined by the court. *Galaxy Outdoor Advertising, Inc. v. Idaho Transp. Dept.,* 109 Idaho 692, 710 P.2d 602 (1985). In construing unambiguous terms, we ascertain the parties' intent from the language contained in the contract. *Suchan v. Suchan,* 106 Idaho 654, 682 P.2d 607 (1984).

However, to the extent that the contract is reasonably subject to conflicting interpretations, or contains absurdities or contradictions, the contract will be deemed ambiguous as a matter of law. *DeLancey v. DeLancey,* 110 Idaho 63, 714 P.2d 32 (1986); *Roeder Min., Inc. v. Johnson,* 794 P.2d 1152 (Ct.App.1990); *Hoffman v. United Silver Mines, Inc.,* 116 Idaho 240, 775 P.2d 132 (Ct.App.1989). Whether terms of a contract are ambiguous is a question of law to be determined by the court, however, once ambiguity is determined, resolution of the ambiguity is a question of fact. *Newman v. Associated Systems, Inc.,* 107 Idaho 922, 693 P.2d 1124 (Ct.App.1985). In

determining the parties' intent under an ambiguous contract, the trier of fact may consider the objective and purpose of the agreement, as well as the conduct of the parties to the agreement. *Bischoff v. Quong–Watkins Properties*, 113 Idaho 826, 748 P.2d 410 (Ct.App.1987). The fact finder must also construe the contract as a whole, rather than focusing on isolated provisions, *Moss v. Mid–American Fire and Marine Ins. Co.*, 103 Idaho 298, 647 P.2d 754 (1982), so as to give effect to every part of the contract, if possible. *Ace Realty, Inc. v. Anderson*, 106 Idaho 742, 682 P.2d 1289 (Ct.App.1984). In the present case, we note that the action was scheduled for trial before a jury, but the trial did not take place as a result of the summary judgment.

1. *The Release Agreement.* In order to determine whether the University breached the release agreement, we must resolve two questions: whether the University assumed contractual obligations under the non-contact provision of the release agreement; and, if so, whether, as a matter of law, the University performed its obligations.

■ George claims that the University breached the following provision in the release agreement:

[I]n addition to the above-referenced mutual considerations of release, the parties further agree that Eckhardt and/or his agents shall refrain from having any intentional contact of any nature at his direction with George or her family,....

The essence of George's claim is that following the execution of this agreement, Eckhardt launched a campaign against George by way of written and oral communications to faculty and students at the law school, newspapers, the Idaho Bar Association, and every registered member of the Idaho State Bar. George claims that Eckhardt did this in an intentional effort to disparage and malign her character and reputation among her peers, instructors, and potential employers. George further claims that Eckhardt's conduct caused her to suffer embarrassment, distress, and disrepute during and after law school, and frustrated many of her efforts to achieve her educational and career objectives. Assuming, solely for the purpose of our review, that the facts presented by George are true, George has raised a genuine issue as to whether Eckhardt's conduct violated the term of the release agreement requiring him to "refrain from having any intentional contact of any nature at his direction with George or her family."

■ Having determined this, we must examine the nature of the law school's obligations under this term of the agreement. George has alleged that, while the University was aware of Eckhardt's post-release-agreement-conduct toward George, the University failed to take any action to prevent or counteract it. To this point, the University's sole response in defense has been that it had no obligation to George under the non-contact provision, arguing that such an obligation could not have been intended, inasmuch as there was nothing the University could do to ensure Eckhardt's compliance. We find the University's argument unpersuasive.

We note, initially, that the express language of the contract is clear that the University is a party to the non-contact provision. The opening sentence of the contract identifies the contracting parties as Eckhardt, the University, and George. The non-contact provision expressly states that "the parties" agree to no contact of any kind between Eckhardt and George. There are several provisions in the contract setting forth duties which pertain to only one or two of the three parties to the contract, and in each of those provisions the contract expressly identifies which party or parties are to be bound by the provision. For example, one provision of the contract states, "Additionally, Eckhardt and the UI hereby agree that this release agreement is subject to each and every provision and condition of Eckhardt's letter of conditional resignation dated January 29, 1986." If the parties intended that only Eckhardt and George were to be bound by the non-contact provision of the contract, they could have expressly stated so, just as they limited the above quoted provision to

Eckhardt and the University. To the contrary, the non-contact provision expressly states that "the parties" agree to no contact of any kind between Eckhardt and George. Thus, the non-contact provision clearly and unambiguously states that the University is party to the non-contact agreement. It is also worth noting that the contract uses mandatory language in referring to what the parties are agreeing to, or promising; that Eckhardt and George "shall refrain" from any kind of contact with each another. Accordingly, we hold that the contract clearly and unambiguously expresses the intent of the parties that the University assume contractual obligations to George under the above-quoted non-contact provision of the release agreement.

However, while the University agreed that there shall be no intentional contact of any kind between Eckhardt and George, the contract fails to indicate the scope and nature of the University's contractual obligation under that provision. We hold that the intent of the parties in this regard cannot be determined clearly from the language of the contract, and therefore the contract is ambiguous on this issue. Therefore, we conclude that the nature and scope of the University's obligation to George under the non-contact provision is a question of fact to be determined by the jury.

█ We note, however, that while the University's obligations to George under the non-contact provision are a question of fact, at the least, the University had a duty to act in good faith and to employ reasonable measures to ensure performance of the non-contact provision. Our Supreme Court has held that, "Good faith and fair dealing are implied obligations of every contract." *Luzar*, 107 Idaho at 696, 692 P.2d at 340. In the context of an employment contract, the Court has held that:

> [T]he covenant [of good faith and fair dealing] protects the parties' benefits in their employment contract or relationship, and ... any action which violates, nullifies or significantly impairs any benefit or right which either party has in the employment contract, whether express or implied, is a violation of the covenant....

*Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 627, 778 P.2d 744, 749 (1989). We believe this rule applies to the contract at issue in this case, and hold that any action by the University which violated, nullified, or significantly impaired George's benefits under the non-contact agreement violated the University's implied covenant of good faith under the contract. Under this rule, action by the University would include a failure to act where a duty to act was present. This implied covenant of good faith and fair dealing should not, however, be applied to impose any duty which is contrary to the agreement as executed by the parties. *First Security Bank of Idaho v. Gaige*, 115 Idaho 172, 176, 765 P.2d 683, 687 (1988).

Pursuant to the above rules, we hold that the University had a duty to perform its obligation under the release provision in good faith. However, the covenant of good faith does not require the University to perform any action that would be contrary to the express terms of the release agreement. The scope of the University's obligation under the agreement, and whether the University breached its duty to perform that obligation in good faith, are questions to be determined by the jury.

We do not accept the University's contention that, as a matter of law, there is no action the University could have taken consistent with the release agreement which would have assisted George in obtaining the benefits of the non-contact agreement. It is for the jury to determine whether George can show at trial some reasonable actions that the University might have taken, consistent with its own policies, either to prevent or counteract Eckhardt's harassing conduct.

The University had a good faith obligation to take reasonable measures to ensure that George obtained the benefits of the non-contact provision of the release agreement, and a jury, based on the facts before us, could find that the University breached that obligation by failing to take

**38**

reasonable measures that George can prove were available to it.

■ 2. *The Implied University/Student Contract.* Our Supreme Court has held that "the principal relationship between a college and its students is contractual." *Wickstrom v. North Idaho College,* 111 Idaho 450, 452, 725 P.2d 155, 157 (1986). In *Wickstrom,* the Court further stated:

Since a formal contract is rarely prepared, the general nature and terms of the agreement are usually implied, with specific terms to be found in the university bulletin and other publications; custom and usages can also become specific terms by implication.

*Wickstrom,* 111 Idaho at 452, 725 P.2d at 157 (quoting *Peretti v. State of Montana,* 464 F.Supp. 784, 786 (D.Mont.1979) (rev'd on other grounds, *Montana v. Peretti,* 661 F.2d 756 (9th Cir.1981)). We hold, based on the excerpts of the University's Faculty–Staff Handbook quoted above, that the University had an implied contractual obligation "to fulfill its responsibilities in pursuit of the academic goals and objectives of all members of the university community," including George. The University also had an implied contractual obligation to investigate suspected cases of sexual harassment, and, where sexual harassment was found, to "take immediate and appropriate corrective measures, including disciplinary action commensurate with the scope and severity of the occurrence." In addition, the University had an implied duty to "make every effort to provide appropriate relief for the victim."

■ We note that the University's implied contractual obligation to George as a student was distinct from the University's obligations to George under the release agreement. The University's obligations under the implied University/student contract were limited in time to George's tenure as a student at the University, and in scope to reasonable, good faith efforts to provide an harassment-free educational environment. The University's obligation under the release agreement differed in both these respects, in that it was not expressly

limited to George's tenure as a student, and, under the release agreement, the University promised that Eckhardt would have no intentional contact of *any kind* with George, harassing or otherwise.

Eckhardt remained an employee, and George a student, of the University after execution of the release agreement. The January 29, 1986, release of all claims regarding Eckhardt's pre-release sexual harassment of George did not release the University from its duty to respond to Eckhardt's post-release sexual harassment against George, one of its students.

We hold that George has presented facts upon which a jury could conclude that Eckhardt's post-release conduct was retaliation against George for past rejections of his sexual advances, and, thus, sexual harassment. Based on those findings, a jury could also find that the University breached its duty under the implied University/student contract to investigate Eckhardt's conduct, to take immediate and appropriate corrective measures, and to make every effort to provide appropriate relief for George. Because George has created a genuine issue as to whether the University breached its implied contractual duties owed to George as a student of the University, summary judgment on that claim was improper.

Conclusion

Based on the facts and reasoning set forth above, we hold that, as a matter of law, the University owed contractual obligations to George under the non-contact provision of the release agreement and under the provisions set forth in the University's Faculty–Staff Handbook. The University was bound to perform its obligations under those contracts in good faith. We further hold that the facts presented, when viewed in a light most favorable to George, raise genuine issues regarding: (1) the scope of the University's obligation under the release agreement, and (2) whether the University breached its obligations to George under either or both contracts. Therefore, we vacate the summary judgment with respect to George's contractual

claims and remand the action for further proceedings.

WALTERS, C.J., and SWANSTROM, J., concur.