857 P.2d 611

TWIN LAKES VILLAGE PROPERTY ASSOCIATION, INC., a non-profit Idaho corporation, Plaintiff–Counterdefendant–Respondent,

and

TWIN LAKES INVESTMENT, Intervenor–Counterdefendant–Respondent,

v.

Eric Aune and Carol Aune, husband and wife, Gib Brumback and Susan Brumback, husband and wife, Buck Brumblay and Barbara Brumblay, husband and wife, Gary Crandall and Dianne Crandall, husband and wife, Phyllis Hardy, a single person, Jim Lowman and Cheryl Vaughn, husband and wife, Harry Stowell, a single person, Charles Strang, a single person, Sherman Blake and Betty Chase Blake, husband and wife, Defendants–Counterclaimants,

and

John CROWLEY, a single person, Jason Day and Leora Day, husband and wife, Don Dickson, a single person, Stan Moore and Ina Moore, husband and wife, Ferman Pasold, a single person, Udo Zeidler and Pam Zeidler, husband and wife, Augie Klaue and May Klaue, husband and wife, Defendants–Counterclaimants–Appellants.

No. 19134.

Supreme Court of Idaho,
North Idaho, October 1992 Term.

July 29, 1993.

Witherspoon, Kelley, Davenport & Toole, P.S., Coeur d'Alene, for appellants. Edward J. Anson, argued.

Paine, Hamblen, Coffin, Brooke, & Miller, Coeur d'Alene, for respondent Twin Lakes Village Property Ass'n, Inc.; Lukins & Annis, Coeur d'Alene, for respondent Twin Lakes Inv. Mary M. Palmer, Spokane, Washington, argued.

BISTLINE, Justice.

The stipulated facts and documentary evidence submitted to the trial court show that the Twin Lakes Village Property Association, Inc., ("the association") is a non-profit corporation. In July of 1973, Pack River Properties, Inc., a Washington corporation, created the Twin Lakes Village Subdivision in Kootenai County, Idaho. The subdivision originally had a nine-hole golf course, a clubhouse, tennis courts, and a swimming pool, as well as other amenities, for the use of the association members. Members paid a separate annual fee in order to use the golf course.

In 1985, Pack River gave notice that it would cease to operate the properties at Twin Lakes Village. After the announcement, the membership of the association explored ways to continue the operation of association's amenities and other necessary services.

In 1986, Twin Lakes Investments ("TLI") purchased the Pack River properties. After the acquisition, meetings were held about the future operation of the amenities and services. By September, the association board of directors had developed, for submission to the membership, a plan which included the acquisition by the membership from TLI of the existing nine-hole golf course, together with additional property for the construction of nine more holes of golf course, and all other of the existing membership amenities. The plan was sub-

mitted to the membership. The association's board of directors drafted proposed amendments to the articles of incorporation, the bylaws, and the protective covenants in order to accommodate the purchase of the golf course and to provide for its future development and operation, as well as the other services and amenities. These proposed amendments: 1) changed the voting structure of the membership from a weighted system based upon square footage of property owned within the village to a one lot-one vote system; 2) eliminated provisions which forbid any amendment to the bylaws which would (a) deprive a member of a then existing right or privilege or (b) effect a fundamental change in the policies of the association; and 3) permitted the acquisition and improvement of the golf course.

These proposed amendments were passed by the membership on January 24, 1987. After the approval of the amendments, the issue of the property purchase from TLI was submitted to the membership for vote, and was accepted and passed by the majority. This vote was in accordance with the provisions of the newly adopted amended bylaws. TLI, as owners, did not exercise their rights to act, vote or participate in the voting action to approve the purchase by the association.

The board thereafter levied a new assessment on all memberships for the purposes of acquiring, developing and operating the property and for the further development of the golf course by an additional nine holes. This assessment was in addition to the regular annual assessment previously paid by the members before January 24, 1987. The association and TLI entered into an agreement of purchase on April 3, 1987.

The association instituted a declaratory judgment action against those association lot owners who had failed to pay the assessments. The defendant lot owners counterclaimed, arguing that the actions taken by the association were invalid under the original corporate documents. They also sought a declaratory judgment as to the effect of the assessments.

TLI was allowed to intervene in this matter.

The defendants asserted at trial that they were not required to pay the assessment, in part, because the amendments to the bylaws which permitted the purchase of the golf course and amenities were void because they violated Article 8 of the original bylaws (hereinafter "the protective covenants"), which places limitations on the members' ability to amend the bylaws. The protective covenants provide:

*These By–Laws may be repealed or amended by a vote representing two-thirds of the assessable lands held by the members* present at any regular meeting of the association, or at any special meeting of the association called for that purpose, *except that the members shall not have the power* to change the purposes of the association so as to decrease its rights and powers under the laws of the State, or to waive the requirement of bond or other provision for the safety and security of the property and funds of the association and its members, or *to deprive any member of rights and privileges then existing, or so to amend the By–Laws as to effect a fundamental change in the policies of the association....*

(Emphasis added.) Further, the members argued that the extraordinary assessment imposed to finance the purchase did not pass by the required super-majority of votes as required by the amended bylaws.

The district court, sitting without a jury, ruled for the property association. The court held that:

1. The articles of incorporation, the bylaws, and the original protective covenants were properly and lawfully amended.

2. The amendments to these documents did not effect a fundamental change in the policies of the Association.

3. While the original voting system was changed as a result of the amendments, the defendants did not assert or show that the new "one ownership-one vote" system affected the outcome of the vote or that their

rights were prejudiced by this change.

4. The assessments were lawfully imposed upon its members.

5. The plaintiff was entitled to judgment and prejudgment interest against the defendants.

Some but not all of the defendants appealed from the district court's ruling. (The appellants are hereinafter referred to as the members.)

### DISCUSSION

The members make four arguments on appeal:

1. That the amendment of the bylaws that eliminated the protective covenants violated those same covenants.

2. That the protective covenants were violated when the bylaws were amended to change member voting rights to a one lot-one vote system from the previous system, which allotted voting strength on the basis of the amount of property owned within the village.

3. That the amendments to the bylaws that permitted the purchase of the golf course violated the protective covenant that forbids any amendment that changes the fundamental policies of the association.

4. That the assessments imposed against the members in order to purchase and operate the golf course did not pass by the required number of votes.

 In order to resolve these issues, we must construe the bylaws. Because corporate documents are equivalent to contracts among the members of the association, the normal rules governing the interpretation of contracts apply. *See Black v. Glass*, 438 So.2d 1359, 1367 (Ala.1983); *American Center for Educ. Inc. v. Cavnar*, 26 Cal.App.3d 26, 32, 102 Cal.Rptr. 575, 580 (1972). The objective in interpreting contracts is to ascertain and give effect to the intent of the parties. *See Luzar v. Western Sur. Co.*, 107 Idaho 693, 697, 692 P.2d 337, 341 (1984). The intent of the parties should, if possible, be ascertained from the language of the documents. *Suchan v. Suchan*, 106 Idaho 654, 660, 682 P.2d 607, 613 (1984). The determination of

a contract's meaning and legal effect is a question of law when the contract is clear and unambiguous. *Bondy v. Levy*, 121 Idaho 993, 996–97, 829 P.2d 1342, 1345–46 (1992).

We conclude, for the reasons expressed below, that: 1) the amendment which eliminated the protective covenants is invalid; 2) the change in voting structure is invalid; 3) the purchase of the golf course did not effect a fundamental change in the policies of the association; but 4) the members are not required to pay the assessments because of the irregularities in the voting on those measures. Consequently, we affirm the order of the district court in part and reverse it in part.

1. **The Amendment of the Bylaws Which Eliminated the Protective Covenants is Void.**

 When the bylaws were amended, the prohibition against depriving any member of then-existing rights and privileges and the prohibition against effecting a fundamental change in the policies of the association were eliminated. The members challenge these changes as violative of the provisions they eliminated.

We agree with the members. If the elimination of those covenants are allowed to stand, the members, who invested substantial sums of money believing they were joining a homeowner's association in order to protect and preserve their investment, could, by majority vote of the other owners, be subjected to unrestricted changes in the nature, purposes, policies, and rules of the association. This would not be so under the protective covenants. The protective covenants created a right to be free from fundamental change and made inalienable all rights and privileges currently possessed by the members. Because the elimination of the protective covenants eliminated those rights, the amendment is in violation thereof and thus is void.

2. **The Amendments to the Voting Rights Bylaws are Invalid Because The Amendment Deprived the Members of An Existing Right.**

 Prior to the 1987 amendments, votes were allocated according to square

foot ownership within the plat. That formula was changed to one of "one lot-one vote." Thus those owners who made a larger investment in the association no longer had a larger say in the running of the association as a result of the amendment. The members argue that the amendments that changed the voting system violated the protective covenants by depriving certain members of their then-existing voting rights.

In order to resolve this issue, we must determine the extent of the members' voting rights in order to determine whether the amendments were a deprivation thereof. Prior to the amendments, Article 3 of the articles of incorporation listed among the "rights of the members" that "the voting rights of each membership in the association shall be in the same proportion as the square footage of the lot owned or being purchased bears to the total square footage of land in the plat, exclusive of the platted common areas and public roadways." Thus, the members' voting rights consisted of two separate and independent rights: 1) the right to the vote itself and 2) the right to the manner by which the vote was weighted.

The association argues that the elimination of the second rights only "diminished" the voting rights because the members still have the first right in its entirety. This argument cannot prevail, however, because even if only one of the members' two voting rights was eliminated, the fact remains that the second right was totally eliminated. Thus we declare the amendment that changed the voting structure to be void as violative of Article 8 of the original bylaws because the members were totally deprived of a right then existing.

### 3. The Amendments Which Permitted the Purchase of the Golf Course Did Not Effect a Fundamental Change in the Policies of the Association.

■ Finally, the members argue that the purchase of the golf course effected a fundamental change in the policies of the association and is therefore invalid. They point to Article 3, which states, in relevant part,

> Pecuniary gain is not the object of this Corporation. The purposes for which this corporation is organized are generally, but not limited to the holding and maintaining in accordance to the By-Laws as from time to time adopted and amended, the common areas ... and any other property it may subsequently acquire.... within said plat; maintaining and supervising control of the architectural design of improvements placed upon the property in said plat, and through the architectural control committee to be created under the By-Laws of this corporation and its other proper officers, to interpret and enforce the protective and restrictive covenants....

The members argue that a fundamental change occurred when the association became the owner and operator of an entrepreneurial venture, where before the main function of the association was as a caretaker of the common areas. The association is quick to point out that the article goes on to provide that "[i]n addition to these general purposes but without limitation thereof," the association "shall have all the powers of corporations provided for under state law including the power to purchase real property, borrow money," and "[t]o acquire and hold as common areas [real property] pursuant to the protective covenants ... and to maintain and improve the same for benefit of the members and to make assessments therefor subject to these Articles and the By-Laws."

■ We conclude the purchase, financing, improvement, and maintenance of the golf course falls squarely within the powers expressly granted to the association. It necessarily follows that the exercise of the power expressly granted in Article 3 could not be considered a fundamental change in the policies of the association as contemplated by Article 8. Otherwise, the

powers never would have been granted to the association and that portion of the Articles of Incorporation would be rendered a nullity. This interpretation is consonant with our rule that various provisions in a contract must be construed, if possible, so to give force and effect to every part thereof. *Wright v. Village of Wilder*, 63 Idaho 122, 125, 117 P.2d 1002, 1003 (1941); *see George v. University of Idaho*, 121 Idaho 30, 36, 822 P.2d 549, 555 (Ct.App.1991).

■ Our conclusion, that the amendment authorizing the purchase of the golf course did not effect a fundamental change, does not mean the purchase is otherwise valid because, as we held in part 2 above, the method by which the purchase was approved (the one lot-one vote system) was invalid. The association argues that any error in that regard should be deemed harmless because the members have not shown any prejudice from the change in voting structure, i.e., that the result of the balloting would have been different.[1] We disagree. Idaho Rule of Civil Procedure 61 permits a court to reverse a judgment whenever such action is required to do "substantial justice." Given the difficulties in proving prejudice in this case along with the fundamental character of the right to vote, we conclude it would be fundamentally unfair to allow the results of the ballot to bind the members. Thus, although we do not invalidate the purchase of the golf course, we do hold that the members are not liable for any assessments to fund the purchase, maintenance, or operation of the golf course unless the purchase and assessments are properly approved pursuant to the original voting structure.

### 4. The Assessments Were Not Properly Approved Under the Amended Bylaws.

■ The final issue raised by the members is whether, assuming the legitimacy of the change in voting structure, the assessments imposed for the purchase and main-tenance of the golf course were properly approved under the terms of the amended bylaws. Even though we held in part 3 above that the members are not liable for the assessments currently imposed, we address this issue to give guidance in case the association decides to attempt to impose assessments in the future.

### a. *Any extraordinary assessment must be passed by a two-thirds majority.*

After the acquisition of the golf course was approved, the membership voted to impose a one-time assessment of $4000 to be applied towards the purchase of the golf course. Sixty-three percent of the membership voted in favor of this assessment. The assessment, according to the members, is invalid because it did not pass by a two-thirds majority of the total voting power of the association as required by Article 6 of the amended bylaws.

Article 6 of the amended bylaws provides that extraordinary assessments may not exceed twenty per cent of the budgeted gross expenses, excluding reserves, for that fiscal year without the assent of two-thirds of the voting power of the Association. It is undisputed that the $4000 assessment exceeded the twenty per cent amount. Thus, the members claim that this assessment is invalid because it was approved by sixty-three per cent of the membership instead of the sixty-six per cent required. The association argues that Article 15 permitted the assessment to be approved by a simple majority. Article 15 specifically deals with the acquisition of the golf course and Article 15.3(a) permits a simple majority to determine whether "to purchase the golf course for cash or other consideration to be raised by Extraordinary Assessment and/or third party borrowing." Article 15.3(d) goes on to state that Article 15.3 is intended to "allow all decisions with respect to the acquisition, operation and maintenance to be made by a majority of a quorum of the voting power."

---

1. It is not clear on the record before us whether the members could have made such a showing. If the membership voted by secret ballot it would be nearly impossible to determine what the outcome of the voting would have been had the original voting system been used.

We first note that the Court will read a contract as a whole and will give meaning to all of its terms to the extent possible. *Magic Valley v. Pro Business Services,* 119 Idaho 558, 565, 808 P.2d 1303, 1310 (1991). The above quoted language from Article 15, however, only permits a simple majority of the members to authorize the *purchase* of the golf course. It does not speak to the approval of the *funding method.* The reference to extraordinary assessments and/or third-party borrowing is a condition on the association's power to purchase the golf course, i.e., the purchasing authority granted by 15.3(a) is conditional upon the approval of an extraordinary assessment and/or third party borrowing. The language does not permit the imposition of an extraordinary assessment with only a simple majority vote. The drafters must have intended Article 15.3(a) to incorporate the supermajority provisions of Article 6 because Article 6.4 states that extraordinary assessments may be used to "acquire additional Common Area (*such as the Golf Course*)." (Emphasis added.) To belabor the obvious, the purchase of the golf course would not have been used as an illustration of a permissible purpose of an Article 6 extraordinary assessment if the drafters did not intend Article 6 to set forth the procedures for the approval of the extraordinary assessment to buy the golf course.

Accordingly, we hold that any extraordinary assessment, including those intended to apply to the purchase of the golf course, must receive a two-third majority vote in favor in order to pass.

b. *The regular assessment to fund the maintenance and operation of the golf course may be passed by a simple majority.*

■ In addition to the $4,000 assessment, a yearly assessment of $720 was approved. The members argue that this assessment is a regular assessment as defined in Article 6. They argue that this regular assessment is also invalid because under Article 6 of the amended bylaws, regular assessments can be set by the Board in an amount not greater than twenty per cent of the regular assessments of the prior year without the vote or written assent of the majority of all members. Here, it is undisputed that the $720 assessment exceeded the amount the Board was empowered to authorize without membership approval. It is also undisputed that the $720 assessment was passed by 63% of those voting, but only 31% of the total voting power. TLI, with 140 of the total 279 votes did not vote on the resolution, electing to abstain, and further did not give its written assent to the assessment. Thus, according to the members, the $720 assessment is invalid because it represents an increase of over 20% from the previous year's assessment and it was not approved by a majority of all of the association's members required by Article 6.

■ The association refers us to Article 15.3(c) which permits a "majority of a quorum of the total voting power" of the membership "to adjust the Regular Assessments as necessary for expenses of operation and maintenance of the Golf Course." We agree with the association that the above language in Article 15.3(c) is clearly intended to control over the Article 6 regular assessment procedures. It is well established that specific provisions in a contract control over general provisions where both relate to the same thing. *Morgan v. Firestone Tire and Rubber Co.,* 68 Idaho 506, 518–19, 201 P.2d 976, 983 (1949). By contrast, Article 15.3(a) is intended to supplement, by incorporation, the Article 6 extraordinary assessments procedures.

Accordingly, we hold that the provisions of Article 15.3(c) control the method by which regular assessments used for operation and maintenance of the golf course may be approved.

## CONCLUSION

We hold that the amendment to the bylaws regarding the members' voting rights is void. All future votes must be conducted under the original voting scheme. We also hold that the amendments to the bylaws that permitted the purchase of the golf course did not effect a fundamental

change in the policies of the association. However, because of the irregularities in the voting, we hold that the members are not liable for those assessments. Any future extraordinary assessments must pass by a two-thirds majority. Any future regular assessments for operation and maintenance need only a majority vote to pass. Finally, the amendments to the protective restraints are void. Costs on appeal to the appellants. The respondent's request for attorney fees is denied.

McDEVITT, C.J., and JOHNSON and TROUT, JJ., concur.

BAKES, J. (Ret.), who fully participated prior to his retirement on February 1, 1993, concurs.