939 P.2d 542

**STAR PHOENIX MINING COMPANY,**
an Idaho corporation, Plaintiff–
Respondent–Cross Appellant,

v.

**HECLA MINING COMPANY,** Defendant–
Appellant–Cross Respondent.

**HECLA MINING COMPANY,** Plaintiff–
Appellant–Cross Respondent,

v.

**STAR PHOENIX MINING COMPANY,**
an Idaho corporation, Defendant–
Respondent–Cross Appellant,

and

Building Maintenance and Supply, Inc., an
Idaho Corporation; Dynatec Mining
Corporation, a Colorado Corporation;
Cominco, Ltd., a Canadian Corporation;
State of Idaho, a Sovereign State;
Bunker Limited Partnership, an Idaho
Corporation; XYZ, Inc., I–X, Whose
True Names are Unknown, and John
Doe I–X, Whose True Names are Un-
known, Defendants.

Frank D. DUVAL and Janice E. Duval,
husband and wife, Plaintiffs,

v.

**HECLA MINING COMPANY,**
a Delaware corporation,
Defendant.

No. 21487.

Supreme Court of Idaho.
Boise, April 1996 Term.

April 2, 1997.

Rehearing Denied July 14, 1997.

Evans Keane, L.L.P., Coeur d'Alene; Fred M. Gibler, Kellogg; Lukins & Annis, Edward W. Kok, Coeur d'Alene; Hawley, Troxell, Ennis & Hawley, Boise, for appellants. John F. Kurtz, Jr. argued.

Witherspoon, Kelley, Davenport & Toole, P.S., Coeur d'Alene, and John F. Magnuson, Coeur d'Alene, for respondents. Jeffrey L. Supinger argued.

JOHNSON, Justice.

This is a breach of contract case concerning a mining lease. We conclude that there are no implied terms of the lease that were breached by the lessor. Therefore, we reverse the judgment against the lessor and remand the case to the trial court with directions to enter judgment in favor of the lessor, including attorney fees pursuant to I.C. § 12–120(3). We also conclude that the trial court correctly ruled that some documents sought from the lessor in discovery were privileged but direct the trial court on remand to consider an award of sanctions against the lessor for discovery violations.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS

Hecla Mining Company (Hecla) and Bunker Limited Partnership (Bunker) each owned an undivided one-half interest in the Star Unit Area (the unit), which included the Star–Morning Mine (the mine). Under a 1961 agreement, Hecla agreed to pay all operating costs and Bunker agreed to reimburse Hecla for its one-half share of those costs. Hecla acted as manager of the unit. By 1988, Hecla claimed Bunker owed it $1,800,000 for its share of unit costs.

In 1984, Hecla leased the mine to Star–Morning Mining Company (Star). Star subsequently defaulted on its obligations under this lease. Hecla proposed to sell its share of the unit to Bunker, but Star claimed to have a continuing lease interest in the mine, despite its earlier default. Star's claims were an obstacle to Bunker's plans to finance the purchase, and negotiations between Hecla and Bunker were unsuccessful. Hecla converted the transaction to a lease-purchase option in favor of Star Phoenix Mining Company (Star Phoenix), an entity formed by the president of Bunker's general partner and two other parties.

On July 6, 1989, Hecla, Bunker and Star Phoenix entered into a lease agreement (the lease), by which Bunker and Hecla, as cotenants, leased the mine to Star Phoenix. In separate agreements Hecla and Bunker each gave Star Phoenix options (the purchase

agreements) to purchase their respective interests in the mine. Star Phoenix was obligated to exercise its purchase option within ninety days of the successful resolution of pending litigation between Hecla and Bunker, as lessors, and Star, as lessee. This litigation was resolved in favor of Hecla and Bunker in *Hecla Mining Co. v. Star–Morning Mining Co.*, 122 Idaho 778, 839 P.2d 1192 (1992).

Star Phoenix agreed in the lease that it would "not allow liens to remain on or encumbrances to attach to the property, which arise out of any act or omission upon the part of Star Phoenix." The lease also contained a section entitled "Defaults—Forfeiture" (Article 17):

> Bunker and Hecla shall have the right in their sole discretion, individually and separately, to terminate this Agreement for default by Star Phoenix. In the event that Bunker or Hecla claims that a default has occurred or is occurring in Star Phoenix's performance of any obligation or obligations under the terms of this Agreement, Bunker or Hecla may serve written notice upon Star Phoenix that Star Phoenix is, or is claimed to be, in default, stating in such notice the particulars of the alleged default and requesting correction thereof. Upon receipt of any such notice, Star Phoenix shall have thirty (30) days from and after receipt of such notice within which to begin the correction of any and all actually existing defaults specified in such notice and shall diligently prosecute such correction until such default or defaults have been remedied.... If any actually existing default or defaults which have been specified in any such notice are not remedied in the manner specified in this Article 17, then Bunker or Hecla may, at their sole option and by written notice, declare this Agreement terminated. If any controversy or dispute arises between the parties as to whether any claimed default or defaults have actually occurred or are actually occurring, Bunker's or Hecla's notice of termination for default notwithstanding, such controversy or dispute shall be submitted to judicial determination, and no action with respect to any such alleged default need be taken by Star Phoenix

> unless and until final judicial proceedings have determined that such alleged default or defaults actually occurred or were actually occurring, and Star Phoenix's time within which to remedy or begin remedying such default or defaults shall not begin to run until final judicial proceedings have so determined.
>
> . . . .

In a separate agreement, Bunker and Hecla agreed to terminate their previous agreement concerning the unit and to settle all their financial claims concerning the unit in return for Bunker's payment of $891,450 to Hecla upon Star Phoenix's purchase of the property and Bunker's conveyance to Hecla of its interest in four claims within the unit.

As part of its efforts to rehabilitate and commence operation of the mine, Star Phoenix entered into a loan agreement (the loan agreement) with Cominco, Ltd. (Cominco), a Canadian corporation, which loaned Star Phoenix $1,000,000. The loan agreement referred to the lease and provided that Cominco could terminate its loan obligation to Star Phoenix and accelerate all amounts owed upon the occurrence of a default. Events of default included the cessation of mining operations by Star Phoenix.

Star Phoenix, Hecla, Bunker and Cominco entered into an agreement and assignment of lease and asset purchase agreements (the assignment agreement), by which Star Phoenix pledged its interest in the lease and the purchase agreements as security for the Cominco loan. The assignment agreement required either Hecla or Bunker, or both, to send notice of any default or termination of the lease to Cominco at the same time the notice was sent to Star Phoenix and stipulated that, "nothing herein shall be construed to prevent or limit Hecla's or Bunker Limited's rights to declare a default or to terminate the Lessee's or any successor's interest therein upon default."

Cominco later agreed to loan Star Phoenix an additional $1,000,000. Star Phoenix and Cominco added to the loan agreement two additional reasons for which Cominco could declare a default: (1) if Star Phoenix was in default under the terms of the lease, and (2)

if the rights of Star Phoenix became subject to termination within a succeeding period of not more than thirty days. Bunker and Hecla consented to these additions.

In June 1990, a bank (the bank) agreed to provide a $750,000 line of credit to Star Phoenix. Star Phoenix used this line of credit and the Cominco loans to finance approximately $3,600,000 in pre-production costs at the mine.

Also in June 1990, Hecla learned that a supplier (the supplier) of materials to Star Phoenix had recorded a $164,393.18 materialmen's lien (the lien) against the mine for preproduction materials. In a letter dated June 26, 1990, Hecla advised Star Phoenix that it considered the lien to be a violation of the lease, but it did not formally notify Star Phoenix of a default at that time due to assurances Hecla received from the supplier and Star Phoenix that the matter was being resolved. Hecla reserved its right to place Star Phoenix on notice of default pursuant to the lease "if [the supplier's] lien remains on the property or if any further liens are filed against the property." Hecla also expressed concern about Star Phoenix's ability to pay its creditors and notified Star Phoenix of Hecla's desire to review Star Phoenix's books and records pursuant to the lease.

On July 5 and 6, 1990, a Hecla auditor (the auditor) conducted a review of Star Phoenix's books and reported that Star Phoenix: (1) owed $1,400,000 to its trade creditors, (2) had not made any federal employee withholding or FICA deposits since February 1990, and (3) had total liabilities as of June 30, 1990, of approximately $5,478,418.

On July 15, 1990, another mining company (the second supplier), which had performed work at the mine for Star Phoenix, recorded a $171,363.70 lien (the second lien) against the mine. On July 30, 1990, Hecla sent Star Phoenix a notice (the default notice) pursuant to Article 17 of the lease that the lien and the second lien constituted defaults and advised Star Phoenix that it had thirty days from receipt of the letter to cure or commence to cure the claimed defaults. Hecla demanded a written proposal of the steps Star Phoenix intended to take to cure within the thirty-day period. As required by the assignment agreement, Hecla forwarded copies of the default notice to Bunker and Cominco.

On August 15, 1990, Cominco's attorneys requested that Star Phoenix obtain from Hecla a withdrawal of the default notice or an agreement from Hecla to "provide another notice and subsequent thirty day period before having the right to terminate the Lease." Cominco stated that, "[i]f Hecla does not provide either the withdrawal notice or a form of estoppel to Star Phoenix, we expect that Star Phoenix would commence an action to seek judicial determination about the status of the defaults, thereby requiring a thirty day period after the judicial determination is rendered before Hecla could take action."

On August 22, 1990, Star Phoenix notified Hecla that the lien had been reduced by $108,436.41 to $56,385.01, and that the second lien had been reduced by $50,000 to $118,188.57. Star Phoenix also advised Hecla that both the supplier and the second supplier had agreed to forego foreclosure action provided Star Phoenix maintained the payment schedule they had agreed to follow. Star Phoenix requested that the default notice be withdrawn.

In a letter dated August 27, 1990, Hecla acknowledged that Star Phoenix had commenced to cure the claimed defaults. Although Hecla declined to withdraw the default notice until the lien and the second lien were released, Hecla agreed temporarily not to take further action with respect to the default notice, but reserved its right to terminate the lease if Star Phoenix failed to cure the defaults.

In a letter dated August 28, 1990 to Hecla (the August 28 letter), Star Phoenix asked for "additional clarification with respect to Hecla's ability to terminate the lease agreement in the event Star Phoenix fails to diligently prosecute the correction of the defaults alleged to have occurred in Hecla's July 30, 1990 notice." In the August 28 letter, Star Phoenix requested that Hecla "agree to give Star Phoenix an additional thirty day notice of its intention to terminate the Lease if Star Phoenix should fail to diligently pursue corrective action." Star Phoe-

nix added that "[t]he additional notice would allow Star Phoenix the opportunity to correct whatever failure may have occurred or otherwise respond to Hecla's notice if there is a dispute." Star Phoenix also stated in the August 28 letter that, "Hecla's agreement to give an additional notice would apply only to the July 30, 1990 notice of default and that such agreement would not operate to prejudice or waive any of Hecla's rights under the lease to give notice of default for any other defaults that may occur." Hecla signed and returned a copy of the August 28 letter to Star Phoenix, indicating Hecla's agreement to the clarification Star Phoenix sought.

On September 26, 1990, Hecla conducted a second audit of Star Phoenix's books. In a memo to officers of Hecla, the auditor reported that Star Phoenix's total liabilities had increased more than $800,000 since the July audit, for a total of $6,275,075. The auditor also reported:

> [One of the principals of Star Phoenix (the principal) ] is optimistic. Production problems have been corrected. Additional ventilation has been installed and the sandfill kinks have been ironed out. [The principal] indicated that 600 tpd (tons per day) were achieved last week and that an average of 600 tpd can be maintained from this point on. The cash flow model we previously generated revealed that if this average could be maintained, and prices held, it would generate sufficient cash flow in the near term to finance ongoing operations and service all debt. . . .

By September 1990, Star Phoenix was approximately $200,000 behind on its payments to Washington Water Power (WWP) which supplied electrical power for the mine. On November 14, 1990, WWP developed a strategy (the strategy) to facilitate payment of Star Phoenix's WWP debt. The strategy centered on Star Phoenix's efforts to secure a $500,000 advance on mineral concentrates from Cominco which would allow Star Phoenix to pay $115,000 to WWP, make current payments, and pay the balance due in twelve monthly installments. If Star Phoenix's efforts failed, however, the strategy provided that the next step was "the termination process." The termination process outlined in

the strategy included a one-week notice of pending termination "to provide for any last minute efforts to pay the debt and to provide adequate time to bring an orderly shut down to the mining and milling operation."

In an October 2, 1990 letter (the October 2 letter), Hecla gave Star Phoenix a thirty-day written notice of Hecla's intention to terminate the lease, as requested in the August 28 letter, and sent copies of the notice to Bunker and Cominco. The October 2 letter stated that, "Star Phoenix must, within 30 days of its receipt of this letter, discharge the above-specified liens in order to remedy these defaults." Star Phoenix did not discharge the liens within thirty days.

On November 2, 1990, Hecla advised Cominco that it would not take any action on the notice of default and intent to terminate contained in the October 2 letter until after November 7, 1990. On November 7, 1990, the principal proposed a plan to Hecla representatives for continued operation of the mine and for the restructuring and payment of Star Phoenix's debts. Hecla found this plan unacceptable. Star Phoenix was under the impression, however, that Hecla had agreed not to take any action until there were further discussions with Star Phoenix.

On November 9, 1990, the second supplier advised Star Phoenix that all amounts owed to it were due and payable because Star Phoenix had made no payment in more than two months. On November 14, 1990, a representative of WWP met with a representative of Star Phoenix and was told that Cominco would probably not advance any additional funds to Star Phoenix. In an inter-office memo dated November 15, 1990, WWP's representative stated that he would be advising the principal that, "a Suspension of Service notice will be mailed to them Monday, November 19, in the amount of $268,474.44 due in full November 28." On the same day, Cominco confirmed in writing to Star Phoenix that it had repeatedly said that it would not loan additional money to Star Phoenix "under any circumstances." Cominco indicated, however, that it would "review the situation with respect to our set off rights after November 2, 1990 if there was a significant infusion of more equity

and if the other creditors of Star Phoenix, including [the bank], also participated in the forbearance."

On November 16, 1990, Star Phoenix agreed with the bank to obtain a capital injection of $500,000 in Star Phoenix by December 1, 1990, with the proceeds to be used to reduce the amount of Star Phoenix's loan from the bank in order to bring it into compliance with the borrowing base.

On November 21, 1990, Hecla faxed and mailed Star Phoenix a notice of termination (the termination notice) stating that it was exercising its termination rights under Article 17 of the lease. Hecla demanded that Star Phoenix immediately cease mining operations and immediately turn over possession of the property to Hecla. In the termination notice, Hecla's CEO (the CEO) stated that based on telephone discussions with Cominco, "It is quite clear to me that Cominco has no intention of extending any further credit or deferring any payments due them under the existing agreements between Cominco and Star Phoenix Mining Company." Hecla sent a copy of the termination notice to Cominco.

The CEO, who made the decision to declare the termination, later testified in a deposition that he made the decision under the belief that (1) the two liens were still in arrears "several hundred thousand" dollars, and (2) pursuant to Article 17 of the lease, Star Phoenix only had thirty days from the date of the October 2 letter to complete cure of the default.

Hecla faxed a copy of the termination notice to WWP the same day it was sent to Star Phoenix. WWP faxed a letter to Star Phoenix stating that the termination notice created "an entirely new and more difficult situation" and requested that Star Phoenix advise WWP as soon as possible concerning (1) how it intended to react to Hecla's notice, (2) whether it intended to continue mining, and (3) how it intended to meet its utility obligations. A WWP official later testified that after November 21, 1990, WWP decided to require a minimum up-front payment of $250,000 from Star Phoenix as a condition to continued service, rather than the $115,000 WWP had originally discussed.

On the afternoon of November 21, 1990, Star Phoenix filed suit seeking a declaratory judgment on the issue of default. Two days later Star Phoenix faxed Hecla a letter warning Hecla that its attempted lease termination would cause Cominco and the bank to withhold funds necessary to continue operations the following Monday. Star Phoenix also advised Hecla that termination of the lease could not be effective unless there was a final judicial determination of a default and unless Star Phoenix had an opportunity to correct the default after this determination. Star Phoenix requested that Hecla notify Cominco and the bank that its "attempted termination notice has been withdrawn pending the outcome of the [declaratory judgment] litigation."

On November 23, 1990, a senior vice president of Hecla (the vice president) told Star Phoenix that Hecla would not withdraw the termination notice. The vice president acknowledged that Cominco and the bank had withdrawn the financing arrangements which allowed Star Phoenix to continue operating, but stated that he did not believe he had the authority to withdraw the termination notice because it was sent by the CEO, and the CEO was unavailable.

November 25, 1990, Star Phoenix notified its employees that it was suspending operations at the mine.

On November 27, 1990, the vice president advised Star Phoenix that the CEO refused to withdraw the termination notice, indicating that Hecla had requested written confirmation of negotiations Star Phoenix claimed it was having with additional equity investors, but that Star Phoenix refused unless and until Hecla withdrew its termination notice. The vice president also stated that it was Hecla's position that its termination of the lease was effective immediately, despite Star Phoenix's declaratory judgment suit. Hecla filed suit that same day against Star Phoenix, Cominco, Bunker, the supplier and the second supplier. In response, the supplier and the second supplier counterclaimed for foreclosure of their liens.

In a letter to the vice president dated November 28, 1990, an attorney for Star

Phoenix stated that he had told Hecla attorneys that Star Phoenix disputed whether the liens constituted defaults under the lease. One of Hecla's attorneys acknowledged at trial that by October 16, 1990, he understood that Star Phoenix disputed the existence of defaults.

On November 28, 1990, Cominco sent Star Phoenix a notice of default and an exercise of setoff rights, with a copy to the bank, stating that Star Phoenix's default under the lease, Hecla's termination of the lease, and Star Phoenix's cessation of mining operations were all defaults under the terms of the loan agreement. On December 4, 1990, WWP terminated its service to the mine. On December 5, 1990, Cominco accelerated repayment of all principal and interest due under the loan agreement.

On December 20, 1990, the bank sent Star Phoenix a formal declaration of default, demanding payment in full by January 9, 1991. As of December 20, 1990, Star Phoenix owed the bank $996,657.14 in principal and interest, with interest accruing at the rate of $299.75 per day.

Hecla moved to dismiss Star Phoenix's declaratory judgment suit. The trial court treated the motion as one for summary judgment and ruled that the conduct of Star Phoenix in permitting the lien and the second lien to remain on the mine property constituted a default pursuant to the lease. The trial court also ruled that summary judgment on the issue of Hecla's termination of the lease was premature because Star Phoenix had no obligation under the lease to commence a cure until after the existence of the defaults was judicially determined. The trial court concluded that Article 17 allowed Star Phoenix an undetermined period of time in which diligently to pursue a cure of the default.

Star Phoenix amended its suit to allege that Hecla engaged in intentional or negligent interference with Star Phoenix's contractual and business relationships. Hecla moved for summary judgment seeking a determination as to whether (1) Hecla interfered with Star Phoenix's contracts or prospective economic advantages, (2) Hecla was liable in tort for intentional or negligent mis-

representation, (3) Hecla breached the implied covenant of good faith and fair dealing, and (4) the parties agreed that Hecla would not terminate the lease.

The trial court ruled that Hecla was entitled to partial summary judgment striking Star Phoenix's causes of action for negligent interference with a contract and the assertion and maintenance of Star Phoenix's defenses of waiver and estoppel based on the alleged existence of an oral agreement by Hecla on November 7, 1990, to restrain from further action absent additional discussions with Star Phoenix. The trial court denied Hecla's motion for summary judgment in all other respects.

The trial court determined the lease was unambiguous as a matter of law and that as a matter of law Article 17 contained an implied covenant that prohibited Hecla from serving a termination notice once it became aware that Star Phoenix disputed its claim of default, and required Hecla to withdraw any attempted termination once the controversy was submitted for judicial determination. The trial court granted partial summary judgment in favor of Star Phoenix.

Star Phoenix sought an order compelling Hecla to produce several internal documents which Hecla claimed were privileged. Following an in camera review, the trial court rejected Hecla's claim of privilege as to all but six of the documents. The trial court concluded that these six documents were privileged either as attorney work product prepared in anticipation of litigation or as attorney-client communications.

The trial court granted Star Phoenix's motion to amend its complaint to include a claim for punitive damages, noting that Star Phoenix claimed entitlement to present evidence regarding punitive damages with respect to its claims that Hecla intentionally interfered with its third-party contractual relationships and intentionally interfered with its prospective economic advantage. The trial court ruled that if Star Phoenix produced evidence at trial that Hecla's conduct was an extreme deviation from reasonable standards of conduct and that such conduct was performed with either malice, fraud, oppression, wan-

tonness, or gross negligence, the trial court would permit submission of the issue of punitive damages to the jury. Star Phoenix did not file an amendment to its complaint claiming punitive damages.

At trial, the trial court instructed the jury that Hecla was in breach of the lease by giving the termination notice and by refusing to rescind the termination notice. At the close of trial, the trial court dismissed all of Star Phoenix's tort claims. The trial court submitted Star Phoenix's claim for punitive damages to the jury.

The jury returned a verdict in favor of Star Phoenix in the amount of $9,999,999.99 in compensatory damages and $10,000,000.01 in punitive damages. The trial court denied Hecla's motions for judgment notwithstanding the jury's verdict or, in the alternative, a new trial or remittitur.

Following the trial, Star Phoenix moved for discovery sanctions against Hecla. Hecla filed this appeal, and the trial court ruled that the appeal divested it of jurisdiction to rule on Star Phoenix's motion. Star Phoenix cross-appealed, challenging the trial court's ruling that some of the documents it sought were privileged and the trial court's ruling that it had no jurisdiction to consider sanctions after Hecla appealed.

## II.

## HECLA DID NOT BREACH THE LEASE.

Hecla asserts that the trial court should not have ruled that Hecla breached the lease by sending the termination notice or by refusing to rescind the termination notice once Star Phoenix filed suit disputing the existence of a default under the lease. We agree.

Before embarking on a discussion of this issue, it is important to note that the jury rendered its verdict in this case solely on a breach of contract theory. There are no tort claims before this Court in this appeal. The scope of our review is directed to whether Hecla breached the lease, not whether Hecla committed some tort against Star Phoenix. Stated in other terms, the trial court dis-missed Star Phoenix's claims for negligent or intentional interference with contract, for negligent or intentional interference with prospective economic advantage, and the claim for waiver and estoppel. All that remained was Star Phoenix's claim that Hecla breached the lease by violating its obligation of good faith and fair dealing. Instead of submitting this alleged breach to the jury for its resolution, the trial court instructed the jury that Hecla breached the lease by giving the termination notice and by refusing to rescind the termination notice. If the trial court was incorrect in instructing the jury that Hecla breached the lease, the trial court's judgment based on the jury's verdict cannot stand, and Hecla is entitled to judgment in its favor.

The trial court based its instruction to the jury that Hecla had breached the lease on the existence in Article 17 of implied covenants that if Star Phoenix advised Hecla that it disputed the claimed defaults, (1) Hecla was not entitled to give a termination notice, or (2) if Hecla had already given a termination notice, it was required to rescind the notice once the controversy was submitted to judicial determination.

It is true that going back to the early days of statehood, this Court has accepted the implication of provisions in contracts. In *Lane v. Pacific and Idaho Northern Ry. Co.*, 8 Idaho 230, 67 P. 656 (1902), the Court said:

> It is a well-established rule that where a party agrees to do a certain thing, and does not specify how it shall be done, the law implies a promise on his part to do it in the usual manner, and that it shall be complete and effectual for the use to which the same kind of thing is generally applied.

*Id.* at 238, 67 P. at 658.

The Court followed this rule in *Long v. Owen*, 21 Idaho 243, 121 P. 99 (1912) in stating:

> Where one contracts to do a piece of work and there is at the time an existing law prescribing the specifications for that kind of work and requiring that all such work be done in accordance with the statute or ordinance, as the case may be, the statute or ordinance becomes a part of the con-

tract, and the one who undertakes to do such work impliedly agree to do it in such a manner as to meet the requirements of law.

*Id.* at 245, 121 P. at 100.

▋ The rule of implied terms was restated by the Court a half century later in *Commercial Insurance Co. v. Hartwell Excavating Co.,* 89 Idaho 531, 407 P.2d 312 (1965): "It is well settled that a contract includes not only what is stated expressly but also that which of necessity is implied from its language." *Id.* at 541, 407 P.2d at 317.

▋ In *Archer v. Mountain Fuel Supply Co.,* 102 Idaho 852, 642 P.2d 943 (1982), the Court applied what it called

> the general rule of contract law that "[t]erms are to be implied in a contract, not because they are reasonable, but because they are necessarily involved in the contractual relationship so that the parties must have intended them and have only failed to express them because of sheer inadvertence or because they are too obvious to need expression." 17 Am.Jur.2d *Contracts* § 255 at 651 (2d ed.1964).

*Id.* at 857–58, 642 P.2d at 948–49.

▋ The Court elaborated its formulation of the rule in *Davis v. Professional Business Services,* 109 Idaho 810, 712 P.2d 511 (1985):

> In every contract there exist not only the express promises set forth in the contract but all such implied provisions as are necessary to effectuate the intention of the parties, and as arise from the specific circumstances under which the contract was made. In implying terms to a contract that is silent on the particular matter in question, only *reasonable terms* should be implied. Such implied terms are as much a part of the contract as those which are expressed.

*Id.* at 813–14, 712 P.2d at 514–15 (emphasis in original) (citations omitted).

▋ We approach the issue of the implication of terms in Article 17 with this rule developed by the Court over the last eighty-five years in mind.

Article 17 of the lease allows Hecla in its "sole discretion" to terminate the lease based on Star Phoenix's default. Article 17 also allows Hecla at its "sole option" to give Star Phoenix a termination notice. Hecla gave Star Phoenix both a default notice by its October 2 letter and the termination notice. Both these notices preceded Star Phoenix's declaratory judgment suit seeking a determination that it was not in default.

We are unable to find any justification for an implication of terms in Article 17 that would prohibit Hecla from giving Star Phoenix a termination notice or that would require Hecla to rescind the termination notice based on the pendency of Star Phoenix's declaratory judgment action. Implying these terms is not necessary to effectuate the intention of the parties, nor is there any showing that these terms were not included in the lease through inadvertence or because they were too obvious to need expression.

Article 17 clearly contemplates that Hecla might have given Star Phoenix a termination notice before Star Phoenix sought a declaration that it was not in default:

> If any controversy or dispute arises between the parties as to whether any claimed default or defaults have actually occurred or are actually occurring, ... *Hecla's notice of termination for default notwithstanding,* such controversy or dispute shall be submitted to judicial determination, and no action with respect to any such alleged default need be taken by Star Phoenix unless and until final judicial proceedings have determined that such alleged default or defaults actually occurred or were actually occurring, and Star Phoenix's time within which to remedy or begin remedying such default or defaults shall not begin to run until final judicial proceedings have so determined.

(Emphasis added).

Article 17 also clearly indicates that the submission to judicial determination of a controversy concerning an alleged default releases Star Phoenix from taking action to cure any default until a determination concerning the alleged default is made by the court and that the time Star Phoenix has to remedy or begin remedying any default does

not begin to run until a final determination by the court that default occurred. No implication arises from these provisions that Hecla is prohibited from giving a termination notice before Star Phoenix seeks a declaratory ruling or that Hecla is required to withdraw the notice once the disputed default is before a court.

The phrase, "Hecla's notice of termination for default notwithstanding" negates the implication that a termination notice may not be given before a declaratory ruling is sought. If Hecla has given a termination notice before Star Phoenix seeks a declaratory determination concerning an alleged default, it is neither necessary nor obvious that an implied term of Article 17 is that Hecla must withdraw the notice. The only implication is that the notice is placed in limbo, pending the outcome of the declaratory determination. To require a rescission of the termination notice would be an unnecessary addition to the lease, which postpones the effect of a termination notice when a judicial determination concerning default is sought to allow Star Phoenix an opportunity to cure any default the court determines exists.

■ In addition, Article 21(d) in the lease provides:

> The parties expressly agree that no implied covenant or condition shall be read into this Agreement relating to the exploration, development, mining of the Property or processing ore therefrom, or the time therefor, or to any operations of Star Phoenix hereunder or to the measure of diligence thereof, or to Star Phoenix's arranging or obtaining financing for any of its obligations under the Asset Purchase Agreements or *any other matter whatsoever.*

(Emphasis added).

This provision negates the implication into the lease of the covenants the trial court implied, and is another basis for our decision.

We decline an invitation to address a violation of the covenant of good faith and fair dealing as a basis for a breach of the lease by Hecla. The jury was not instructed on this theory, and Star Phoenix has not cross-appealed from the trial court's instructions.

Therefore, the issue is not properly before us.

Because of our resolution of the breach of contract issue in favor or Hecla, we do not address other issues raised by Hecla concerning the instructions given by the trial court, the submission of the punitive damage issue to the jury, and the trial court's rulings on post-trial motions.

## III.

### THE TRIAL COURT CORRECTLY RULED THAT SOME OF HECLA'S DOCUMENTS WERE PRIVILEGED. ON REMAND THE TRIAL COURT SHOULD CONSIDER STAR PHOENIX'S REQUEST FOR SANCTIONS.

On cross-appeal, Star Phoenix asserts that the trial court incorrectly ruled that some of the documents Star Phoenix sought to discover from Hecla were privileged as attorney work product and that the trial court incorrectly ruled that it lacked jurisdiction to rule on Star Phoenix's motion for discovery sanctions once Hecla perfected its appeal to this Court. We disagree.

■ The lawyer-client privilege allows a client to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating rendering professional legal services to the client. I.R.E. 502(b). The documents the trial court ruled were privileged fell within this category.

■ It is well established that "[o]nce the proceedings are stayed by appeal, the district court ordinarily is divested of jurisdiction to act in any manner ... except to act in aid of and not inconsistent with the appeal." *Coeur d'Alene Turf Club, Inc. v. Cogswell*, 93 Idaho 324, 329, 461 P.2d 107, 112 (1969). The trial court was correct in ruling that it lacked jurisdiction to decide discovery sanctions once an appeal had been filed. The appropriate course for us to follow at this juncture is to remand this issue to the trial for its consideration of sanctions.

## IV.

### CONCLUSION

We reverse the judgment against Hecla and remand the case to the trial court for entry of judgment in favor of Hecla and for further proceedings as directed below.

We affirm the trial court's ruling concerning the privileged nature of some of Hecla's documents that Star Phoenix sought to discover and the trial court's ruling that it lacked jurisdiction to consider Star Phoenix's request for sanctions once Hecla had appealed to this Court. On remand, we direct the trial court to consider the award of sanctions.

We award Hecla costs on appeal. On remand, we direct the trial court to award attorney fees, including those on appeal, to Hecla pursuant to I.C. § 12–120(3).

TROUT, C.J., McDEVITT, J., and WOODLAND, Justice Pro Tem, concur.

SCHROEDER, Justice, dissenting.

### I.

### HECLA BREACHED THE LEASE AS A MATTER OF LAW.

The district court ruled that Hecla breached the Lease as a matter of law by sending the notice of termination in the first instance or, in the alternative, by refusing to withdraw the notice once Star Phoenix filed suit disputing the existence of a default under the Lease. This Court's reversal of that decision misses the significance of the facts in this case and the legal consequences that flow from those facts.

#### A. Construction of Article 17

"The objective in interpreting contracts is to ascertain and give effect to the intent of the parties." *Twin Lakes Village Property Ass'n, Inc. v. Crowley*, 124 Idaho 132, 135, 857 P.2d 611, 614 (1993). The intent of the parties should, if possible, be ascertained from the language of the contract. *Id.*

A contract containing a promise clearly expressed in words may be found to contain another promise by "implication." *3 Corbin on Contracts* § 561. "[A] contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made." *Sacramento Nav. Co. v. Salz*, 273 U.S. 326, 329, 47 S.Ct. 368, 369, 71 L.Ed. 663 (1927). The implication of a contract term is only justified "when the implied term is not inconsistent with some express term of the contract and when there arises from the language of the contract itself, and circumstances in which it was entered into, an inference that it is absolutely necessary to introduce the term to effectuate the intention of the parties." *Davis v. Professional Business Serv. Inc.*, 109 Idaho 810, 813, 712 P.2d 511, 514 (1985).

"In construing a contract, an interpretation should be avoided that would render meaningless any particular provision in the contract." *Top of the Track Assoc. v. Lewiston Raceways, Inc.*, 654 A.2d 1293, 1296 (Me. 1995); *Wyoming Game & Fish Comm'n v. Mills Co.*, 701 P.2d 819 (Wyo.1985). As a matter of contract law, a term that is implied in a contract provision has the same legal effect as an express term. *Top of the Track Assoc.*, 654 A.2d at 1296; *see also Havel v. Kelsey–Hayes Co.*, 83 A.D.2d 380, 445 N.Y.S.2d 333, 336 (1981) ("The salutary purpose of [an integration clause] is to preclude consideration of matters extrinsic to the agreement. It is of no relevance if the promise, albeit imperfectly expressed, is implicit in the contract as written.")

Article 17 of the lease required any dispute over "default" to be submitted for judicial determination. Once submitted, the time for curing and/or diligently prosecuting a cure of default did not begin to run until after a default was finally judicially determined. The district court imposed an implied obligation "to effectuate the reasonable contemplations of the parties." The district court was correct to point out that in the absence of the implied obligation to withdraw the notice of termination after Star Phoenix filed suit, the protections of Article 17 are meaningless. This Court's failure to imply a term in Article 17 requiring Hecla to withdraw its notice of intention to terminate

pending judicial determination renders the judicial determination provision meaningless. Whether initially in default or not, leaving the notice of termination in place doomed Star Phoenix to certain default. Hecla was well-aware of this fact.

Hecla's president acknowledged that before the termination notice was sent out one "didn't have to be a genius to figure out that [Star Phoenix's] bankruptcy was fairly likely." The president of Washington Water Power, the sole source of electrical power for Star Phoenix, sat on Hecla's Board and certainly knew how the notice of termination would effect both Washington Water Power and Star Phoenix. Prior to the notice Washington Water Power had been willing to work with Star Phoenix. That cooperativeness stopped after the notice of termination. The failure of Star Phoenix was assured when the power went off. Hecla's obdurate refusal to acknowledge the effect of the judicial determination provision rendered that provision meaningless in any realistic sense. Even if Star Phoenix prevailed in court it was financially dead.

The district court and the jury that ultimately decided the case previewed the impropriety of Hecla's conduct. This Court should not ignore the law that validates the district court's action and ultimately the verdict of the jury. "In every contract there exists not only the express promises set forth in the contract but all such implied provisions as are necessary to effectuate the intention of the parties, and as arise from the specific circumstances under which the contract was made." *Davis v. Professional Business Serv.*, 109 Idaho 810, 813, 712 P.2d 511, 514 (1985). At the time the Lease was signed Hecla knew that disputed defaults must be submitted for judicial consideration and, hence, it was the intention of the contracting parties to submit disputed "defaults" for judicial determination. An interpretation of the contract that renders the judicial determination provision useless is contrary to the intent of the parties ascertained from the language of the contract. *Twin Lakes Village Property*, 124 Idaho at 135, 857 P.2d at 614.

### B. Notice of Termination

Based on the language of Article 17 which conditioned Hecla's right to terminate the Lease on Star Phoenix's failure to remedy any actually existing defaults "in the manner specified in this Article 17" the district court concluded that Hecla breached the Lease as a matter of law when it sent the November 21st notice of termination to Star Phoenix. The district court correctly noted that Article 17 only required Star Phoenix to begin correction of "any and all actually existing defaults" within thirty (30) days of receiving written notice of claimed default and to "diligently prosecute such correction until such default or defaults have been remedied." The district court reasoned that Article 17 requires a threshold determination as to whether Star Phoenix diligently prosecuted the alleged defaults before termination is proper.

The district court determined that the provision in Article 17 which states: "Bunker and Hecla shall have the right *in their sole discretion*, individually and separately, to terminate this Agreement for default by Star Phoenix," conditioned Hecla's right to terminate the Lease on Hecla's exercise of discretion. (Emphasis supplied). The court concluded that since Hecla based its decision to terminate the Lease upon the "mistaken belief that there had been *no* prosecution of a cure at all, let alone a diligent prosecution," it did not exercise the requisite discretion in its decision to terminate. The court based this conclusion in large part on the deposition testimony of Hecla CEO Art Brown who testified that at the time he authorized the November 21st notice of termination:

1) he did not know whether anything had been paid on the liens;

2) he believed both liens were in arrears several hundred thousand dollars, while the court concluded they had been paid down by 64 percent in total;

3) he thought the Lease contained a more standard provision requiring Star Phoenix to completely cure any alleged defaults within thirty (30) days of notice;

4) he was unaware that Article 17 required that disputes regarding alleged defaults be submitted for judicial determination; and

5) he was unaware that, under the terms of Article 17, once a lawsuit disputing the existence of the alleged defaults was filed Star Phoenix had no obligation to commence cure until after the court declared the existence of a default.

Hecla's CEO acted in ignorance of the actual facts and provisions of the contract. Most people who ignore the facts and their contracts lose, but the protections that were supposed to inhere in this contract mean nothing.

## C. Failure to Withdraw Notice of Termination

The district court concluded that if Hecla had the right to send Star Phoenix a notice of termination on November 21st it nevertheless had an implied obligation to cease its pursuit of termination and withdraw its notice of termination once suit was filed. The district court based its conclusion on the language of Article 17 which provided that once the issue of default was submitted for judicial determination:

> no action with respect to any such alleged default need be taken by Star Phoenix unless and until final judicial proceedings have determined that such alleged default or defaults actually occurred or were actually occurring, and Star Phoenix's time within which to remedy or begin remedying such default or defaults shall not begin to run until final judicial proceedings have so determined.

The district court explained its conclusion that Article 17 contained an implied covenant requiring Hecla to withdraw its notice of termination once Star Phoenix filed suit in its post-trial memorandum opinion and order:

> [A]n interpretation of Article 17 without the implied covenant is utter nonsense, and renders the language meaningless. Of what conceivable use would entitlement to judicial resolution of the propriety of a "claimed" right to termination be if the lessor could proceed to terminate anyway, just so long as it won the "race" and served notice thereof first? Why, also, would Article 17 include language stating that Star Phoenix had no obligation to begin remedying defaults until "final judi-

cial proceedings have so determined," if Hecla was entitled to keep a notice of termination in place which, it conceded at trial, would naturally stop the operation and bankrupt the lessee? Conventional rules of construction require that interpretation of language that gives meaning and effect to all the language is preferred. It also happens to make perfect sense. If Article 17 is to be interpreted to give effect and meaning to all its language, then why would it be necessary to provide for commencement of cure by Star Phoenix after the Court declares that Hecla is correct on a default dispute if, in the meantime, Star Phoenix is rendered incapable of existence, much less cure? . . .

> . . . . Since the clear purpose of Article 17 was to resolve disputes through judicial review, thus avoiding situations in which creditors would send notices of default, then it is reasonable and necessary to imply that a dispute following a prior notice of termination would require a withdrawal of the notice. Otherwise, subsequent judicial determination in favor of Star would be but a *fait accompli*, Star Phoenix already being out of business. . . .

> The Court is convinced that the implied covenant is necessary in Article 17 in order to effectuate the reasonable contemplations of the parties. With it Article 17 could provide judicial resolution as a means of lifesaving review. Without it, if Hecla could refuse to withdraw its termination, judicial determination could only serve as an autopsy.

This Court relies upon Article 21(d) in the Lease to preclude the implication of a covenant to withdraw the notice of intention to terminate in Article 17. Article 21 states:

> (d) The parties expressly agree that no implied covenant or condition shall be read into this Agreement relating to the exploration, development, mining of the Property or processing ore therefrom, or the time therefor, or to any operations of Star Phoenix hereunder or to the measure of diligence thereof, or to Star Phoenix's arranging or obtaining financing for any of its obligations under the Asset Purchase

Agreements or any other matter whatsoever.

A general rule of contract law is that "where parties have made an express contract, the court should not find a different one by 'implication' concerning the same subject matter if the evidence does not justify an inference that they intended to make one." *3 Corbin on Contracts*, § 564 (1960), p. 93. However, this does not negate the principle in Idaho that, "[g]ood faith and fair dealing are implied obligations in every contract." *Luzar v. Western Sur.*, 107 Idaho 693, 696, 692 P.2d 337, 340 (1984).

This Court defined what constitutes a breach of the covenant of good faith and fair dealing in *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744 (1989), by stating that, "[a]ny action by either party which violates, nullifies or significantly impairs any benefit of the . . . contract is a violation of the implied-in-law covenant." *Id.* at 627, 778 P.2d at 749.

In *Idaho First Nat'l Bank v. Bliss Valley Foods*, 121 Idaho 266, 824 P.2d 841 (1991), this Court quoted with approval from a Washington Supreme Court case, *Badgett v. Security State Bank*, 116 Wash.2d 563, 807 P.2d 356, 360 (1991):

> There is in every contract an implied covenant of good faith and fair dealing. This duty obligates parties to cooperate with each other so that each may obtain the full benefit of performance.

121 Idaho at 288, 824 P.2d at 863. *See also Taylor v. Browning*, 129 Idaho 483, 927 P.2d 873 (1996). "The implied covenant 'requires only that the parties perform in good faith the obligations imposed by their agreement.'" *Record Steel & Constr., Inc. v. Martel Constr., Inc.*, 129 Idaho 288, 923 P.2d 995, 999 (Ct.App.1996) (quoting *Idaho First Nat. Bank v. Bliss Valley Foods*, 121 Idaho 266, 288, 824 P.2d 841, 863 (1991)).

For Star Phoenix to "obtain the full benefit" of Article 17, Hecla was obligated to cease its pursuit of termination and withdraw its notice of termination once suit was filed. All contracting parties in Idaho are subject to the covenant of good faith and fair dealing. By failing to withdraw its notice of termination once Star Phoenix filed suit, Hecla breached the covenant of good faith and fair dealing as a matter of law. Article 17 specified that Hecla's right to terminate the Lease must be "in the manner specified in this Article 17."

As the district court aptly noted "judicial determination could only serve as an autopsy" if the covenant were not implied. A major term of this contract was destroyed by Hecla's refusal to withdraw its notice of termination once the question of default was submitted for judicial determination. Regardless of the outcome of the judicial determination, Hecla would achieve the financial ruin of Star Phoenix with the attendant right to repossess the property including massive rehabilitation work that had been done by Star Phoenix. The Article 21(d) provision precluding implied covenants should not trump the implied in law covenant of good faith and fair dealing that is part of every contract in Idaho. However, the public policy of Idaho has been subverted by a generic disclaimer and the failure to recognize the reality understood by the parties. The parties could preclude implication of a covenant implied in fact, but they should not be allowed to revise Idaho public policy and avoid the implied in law covenant of good faith and fair dealing.

The jury's verdict reflects the overall egregiousness of Hecla's conduct. That egregiousness began with disregard of the facts and the provisions of the contract and continued with the refusal to withdraw the notice of termination and allow the purpose of the judicial determination provision to be realized. Investors, creditors, and numerous employees of Star Phoenix were irretrievably damaged by Hecla's actions. The facts, the contract provisions, and the law that should have protected them have not.

For the above reasons, I dissent from the Court's opinion.